Hillsborough-southern judicial district
No. 2009-617

THE STATE OF NEW HAMPSHIRE

v.

ANDREW FARRINGTON

Argued: January 6, 2011
Opinion Issued: February 23, 2011

*Michael A. Delaney*, attorney general (*Lucy H. Carrillo*, assistant attorney general, on the brief and orally), for the State.

*Meredith Lugo*, public defender, of Keene, on the brief and orally, for the defendant.

DUGGAN, J. The defendant, Andrew Farrington, appeals his conviction by a jury on one count of prohibited uses of computer services. *See* RSA 649-B:4 (2007). On appeal, he argues that the Superior Court (*Fitzgerald,* J.) erred by denying his motion to dismiss based upon sufficiency of the evidence. We affirm.

The jury could have found the following facts. In October 2007, the twenty-one-year-old defendant lived in Londonderry where he owned a computer with internet access. He had an account on the website Facebook.com, which allows individuals to sign up for an account, list personal information about themselves and establish connections with other users on the site. Facebook also has several applications available to users, one of which is called, "Are you interested?" Through this application, users can sign up to have their photographs randomly sent out to other users with the question, "are you interested?" The recipient can then choose one of three options: (1) ignore the question; (2) answer it anonymously; or (3) answer the question and include a reply with the recipient's name.

The defendant received a photograph through this application from A.D. in October 2007 and chose the third option. After their initial contact on Facebook, A.D., who was thirteen years old at the time, and the defendant later communicated through AIM, which is an internet messaging service provided by America Online. The two communicated during October,

November and December 2007, but the earliest transcript of their messages presented at trial was from an AIM chat that occurred on December 6. During that chat, the defendant told A.D. that she was "cute as hell," and that he wished she was older so they could "go chill sometime." When A.D. replied that she was "not that young" and told the defendant she was fourteen, he told her that he "may be able to deal with that." The defendant also told A.D. that she looked a little young in her picture but was "hott as hell," and later told her she was "just so damn cute."

The defendant and A.D. chatted again on December 7, and A.D. told the defendant that she was going to visit a friend in Londonderry. The defendant replied, "what a tease," "you're so cute and you'll be right in town." The defendant also told her to let him know if she wanted to get together while in Londonderry.

On December 9, the defendant again suggested to A.D. that they should "chill sometime" in Londonderry. Additionally, during that chat, A.D. told the defendant that she had just taken a shower and he asked her, "how was ur shower?" "nice and hot and wet?" He again suggested that they meet the next time she came to Londonderry and A.D. replied that she would let him know the next time she was in Londonderry.

During their next conversation, on December 11, A.D. told the defendant that she was a cheerleader, and he replied, "that is wicked hott." A.D. also told the defendant that she was a "flyer" on the cheerleading team, and the defendant asked, "don't they usually make the flyers the hottest ones who are in the best shape?" A few minutes later, the defendant again asked A.D. when they could "chill" and also told her that he was "dying to see just ho[w] hott" she was in person. He also told her that if she did not want to meet him, she could just tell him that, but A.D. replied, "no[,] [I] do."

On December 18, the defendant and A.D. chatted for about fifteen minutes. At the conclusion of their conversation, A.D. said, "sweet dreams don[']t let the bed bugs bite haaa," and the defendant replied, "[I]'ll be dreaming of you." The next evening, the defendant initiated a conversation with A.D. and told her that he had a dream about her. When she asked him what happened in the dream, he replied that she did not want to know because it involved "dirty things." A.D. answered, "no tell me," and he replied, "well, you had IM'd me and told me to come pick you up," "so [I] did and we drove around talking for a bit," "then you put your hand on my lap," "and [I] ended up kissing you," "then somehow we ended up on the back seat." The defendant then described how they engaged in sexual intercourse. He also said, "[I] told you it was dirty" and told her he could probably describe the dream more graphically.

After the defendant told A.D. about the dream, she told her friend, Peter Dunn, about her conversations with the defendant and gave his AIM screen

name to Dunn. Approximately thirty minutes after the defendant told A.D. about his dream, Dunn contacted the defendant to "mess around with him." Dunn told the defendant that he was A.D.'s brother and that A.D. thought the defendant was "hot." Later in their conversation, Dunn invited the defendant to come over the next time his mother was not home and suggested that he, the defendant and A.D. engage in sexual relations with one another. The defendant responded that Dunn was "creepy" and that he was "not into that." However, when Dunn indicated that his "sister" was only thirteen and that the defendant was much older, the defendant answered, "so?"

Later that evening, Dunn again engaged in conversation with the defendant, this time by logging into his AIM account through his cell phone and pretending to be A.D. Dunn, posing as A.D., told the defendant to visit her sometime at her friend's house in Londonderry. Later in the conversation, the defendant and Dunn discussed whether they would meet in person:

[Defendant]: so what are you thinking? . . .

[Defendant]: do you want to hang out?

. . . .

[Dunn]: and your [sic] ok with having sex [with] me right? [L]ike you wouldn[']t tell anyone[?]

[Defendant]: well, if [I] did do that, [I] certainly wouldn't tell anyone

[Defendant]: but who's to say that that would happen[?]

[Dunn]: you don[']t want to have sex?

[Defendant]: of course [I] do . . .

[Defendant]: but [I] mean, you're a little illegal

The conversation then became increasingly sexually graphic and Dunn asked the defendant if he would like "her" to perform oral sex on him and if he would want to try anal sex. The defendant indicated that "[I] like to start with [oral sex]" and that he would be willing to engage in anal sex with A.D. However, the defendant did not ask to engage in sexual relations with the AIM user he thought to be A.D.

Following this conversation, Dunn, again posing as A.D., and the defendant made plans to meet in person, and Dunn provided the defendant with the address of one of Dunn's neighbors. On December 30, the defendant drove to Nashua in an attempt to meet A.D. When Dunn saw the defendant's car, he called the police, who responded, but did not make contact with the defendant that night. During a subsequent interrogation, the defendant stated that he left after seeing a police cruiser because he felt uncomfortable and that he later removed A.D. from his Facebook and MySpace pages because "the whole thing just felt wrong." He admitted however that he went to Nashua that night "to meet an underage girl, um, to have sex with," and that it was "implied that I was interested in having sex with her that night[,] um, when I were to go meet her." He also told police that he brought condoms and lubrication when he attempted to meet A.D. The defendant consented to a search of his home computer and investigators found several chat sessions between the defendant and A.D. At trial, A.D. testified that the defendant never asked to have sexual intercourse with her and that they never discussed meeting to have sexual intercourse. She also indicated that she was unsure why she did not tell the defendant that she was uninterested in meeting him.

At the close of the State's case, the defendant moved to dismiss the charge, arguing that the evidence was insufficient to prove that he attempted to seduce, solicit, lure or entice A.D. If anything, the defendant argued, Dunn, posing as A.D., attempted to seduce, solicit, lure or entice him. The trial court denied the motion, ruling that it was a question for the jury. During jury instructions, the court instructed the jury that they could consider only the chat sessions to establish that the defendant used the internet with the purpose to attempt to seduce, solicit, lure or entice A.D. The jury subsequently convicted the defendant and he appealed.

The defendant's sole argument on appeal is that the State introduced insufficient evidence to prove that he attempted to seduce, solicit, lure or entice A.D. to engage in sexual penetration. "To succeed on a motion to dismiss, the defendant bears the burden of establishing that the evidence, viewed in its entirety and with all reasonable inferences drawn in the State's favor, was insufficient to prove beyond a reasonable doubt that he was guilty of the crime charged." *State v. Lacasse,* 153 N.H. 670, 672 (2006). "[W]e view the evidence and reasonable inferences arising therefrom in the manner most favorable to the State." *Id.* (quotation omitted). Additionally, "we review the evidence in context, and not in isolation." *Id.*

The defendant's argument requires that we construe RSA 649-B:4. "We review a trial court's interpretation of a statute *de novo." State v. Lamy,* 158 N.H. 511, 515 (2009). "We are the final arbiters of the legislative intent as expressed in the words of the statute considered as a whole." *Id.* "We begin

by examining the language of the statute and ascribe the plain and ordinary meaning to the words used." *Id.* (citations omitted). "We interpret legislative intent from the statute as written and will neither consider what the legislature might have said nor add language that the legislature did not see fit to include." *Id.* "We also interpret a statute in the context of the overall statutory scheme and not in isolation. Our goal is to apply statutes in light of the legislature's intent in enacting them, and in light of the policy sought to be advanced by the entire statutory scheme." *State v. Jennings,* 159 N.H. 1, 3 (2009) (quotation and ellipses omitted). Finally, "[w]e construe Criminal Code provisions according to the fair import of their terms and to promote justice." *Id.* (quotation omitted).

RSA 649-B:4 provides, in pertinent part:

> Any person who knowingly utilizes a computer online service, Internet service, or local bulletin board service to seduce, solicit, lure, or entice, or attempt to seduce, solicit, lure, or entice, a child or another person believed by the person to be a child, to commit any of the following is guilty of a class B felony:

> I. Any offense under RSA 632-A, relative to sexual assault and related offenses.

The defendant contends that the trial court erred in denying his motion to dismiss because the State did not present sufficient evidence that he attempted to "seduce, solicit, lure, or entice" A.D. Instead, the defendant asserts, "he merely responded to sexual questions and comments posed to him." The State argues that while the defendant never explicitly asked A.D. to engage in sexual penetration with him, the statute does not require such explicit conduct.

 Our analysis begins with an examination of the statutory language, ascribing the plain and ordinary meaning to the words used. We previously addressed the meaning of the words "seduce, solicit, lure, or entice" in *State v. Jennings.* In *Jennings,* the defendant showed his daughter a pornographic video on an internet website and was convicted of violating RSA 649-B:4. *Jennings,* 159 N.H. at 2. He argued that he did not engage in any proscribed conduct because "he did not utilize a computer online service, internet service or bulletin board service to communicate with his daughter over the internet." *Id.* at 3 (quotation, brackets and ellipsis omitted). In determining that his conduct did violate the statute, we interpreted the phrase, "to seduce, solicit, lure, or entice." *Id.* at 4-5. We determined that the plain and ordinary meaning of "solicit" includes:

> to make petition to: ENTREAT . . . to approach with a request or plea . . . to move to action: serve as an urge or incentive to . . . to

strongly urge . . . insist upon . . . to entice or lead astray by or as if by specious arguments: lure on and especially into evil . . . to endeavor to obtain by asking or pleading: plead for . . . to seek eagerly or actively . . . to have an effect on (a person or thing) through some natural influence or property . . . to seek to affect . . . to serve as a temptation or lure to: ATTRACT.

*Id.* (quotation and brackets omitted). Additionally, we noted that the plain and ordinary meaning of "lure" includes: "to tempt with a promise of pleasure or gain: ALLURE, ATTRACT, ENTICE, INVITE," and that the plain and ordinary meaning of "entice" includes: "to draw on by arousing hope or desire: ALLURE, ATTRACT . . . to draw into evil ways: lead astray: TEMPT." *Id.* at 8 (quotations omitted).

Based upon these definitions, the defendant contends that all four words in the statute require an explicit or affirmative request. We do not interpret the statute so narrowly. Instead, all of the definitions draw upon the common theme of tempting, attracting or leading someone astray. Nowhere in the plain and ordinary meaning do we discern any requirement that the defendant must explicitly or affirmatively ask the victim to engage in sexual penetration as the defendant suggests. While we agree that the defendant did not explicitly or affirmatively ask A.D. to engage in sexual penetration, a jury could have found that the defendant intended his communications to attract, tempt or invite A.D.

In particular, from the beginning of his online relationship with A.D., the defendant repeatedly told A.D. that he found her attractive and expressed his desire to meet her in person on numerous occasions. The defendant also continuously used sexual innuendos directed toward A.D. during their conversations. When the defendant discovered A.D.'s age, he told her that he might be able to "deal with" her age and asked if she had ever been involved with older friends. He also called her a "tease" and told her "you're so cute and you'll be right in town." On another occasion, he told her "[I]'m dying to see just ho[w] hott you are in person." During another conversation, after A.D. told the defendant she had just taken a shower, he asked her if the shower was "nice and hot and wet." In one of their final conversations, the defendant told A.D. about a dream that involved him "f---ing [her] from behind," and also told her that he could be more "graphic." Viewing the evidence in totality, the entire course of the online relationship between the defendant and A.D. establishes that he did attempt to "solicit, seduce, lure, or entice" A.D. *See Lacasse,* 153 N.H. at 673.

The defendant, nonetheless, points to the statements of A.D. and Dunn representing himself as A.D. He argues that "he merely responded when

the subject of sexual activity was raised by . . . Dunn posing as [A.D.]" He contends that Dunn asked him if he was "okay with having sex with" A.D. and he responded that he would not tell anyone if they engaged in sexual relations, but also stated, "who's to say that that would happen." The defendant also argues that Dunn "spoke graphically about sexual matters" to him and invited him to Nashua to engage in sexual intercourse, and that he "merely responded to Dunn's advances with interest." Even assuming that the defendant's conversations with Dunn did not constitute conduct that runs afoul of RSA 649-B:4, the defendant's argument ignores the totality of his conduct over a three-month period. Accordingly, we conclude that the plain and ordinary meaning of "seduce, solicit, lure, or entice" is contrary to the defendant's narrow interpretation of the phrase and we decline to adopt it.

 Even if we could not resolve this issue based upon the plain and ordinary meaning of the statutory language, in *Jennings* we examined the legislative history of RSA 649-B:4 and determined it supported a broad reading of the statute "in light of the statutory scheme's overarching policy of preventing computer pornography, child exploitation, and abuse offenses committed by means of a computer." *Jennings,* 159 N.H. at 8. In construing the statute, we noted "that the legislative history acknowledges the new technology presented by the computer, the expanse of possibilities presented by the internet, and the need for new and broader statutes to assist law enforcement in the protection of children from the types of dangers presented by the same." *Id.* at 5.

 We also reviewed RSA 639:3, III (2007), which was enacted in 1983 and provides that "the solicitation by any person of a child under the age of 16 . . . to engage in sexual penetration as defined by RSA 632-A:1, V, constitutes endangering the welfare of such child." We noted that in enacting RSA 632-A:1, the legislature limited the statutory prohibition to only "solicitation" of a child. *Id.* at 7. However, we concluded that the legislature later included the additional terms "seduce . . . lure, or entice" in RSA 649-B:4 in a clear attempt to "expand the statutory proscription." *Id.* at 8. In light of the legislature's efforts "to target the expanding challenges presented by the powerful new technologies of computers and the internet," *id.* at 7, we cannot say that the defendant's overall pattern of behavior falls outside the conduct prohibited by the statute. While he did not explicitly ask A.D. to engage in sexual penetration with him, he used the internet to exploit A.D.'s youth and innocence in an attempt to lure her into sexual activities. This is exactly the type of conduct the legislature sought to prevent and to accept the defendant's argument would contravene the purpose of the statute. *See id.* at 7-8.

Our broad construction of RSA 649-B:4 is also in line with related federal cases interpreting a United States Sentencing Guidelines sentencing enhancement for use of a computer to entice a minor. *See U.S. Sentencing Guidelines Manual* § 2G1.3(b)(3)(B) (2009) ("If the offense involved the use of a computer or an interactive computer service to entice, encourage, offer, or solicit a person to engage in prohibited sexual conduct with the minor, increase by 2 levels."). In *United States v. Lay,* 583 F.3d 436 (6th Cir. 2009), the defendant pleaded guilty to traveling with intent to engage in illicit sexual conduct, but appealed the application of the sentencing enhancement. *Id.* at 438. The court determined that although the defendant did not explicitly propose sexual relations in a computer message, he still communicated via computer with the victim with the apparent intention of having sexual relations with her. *Id.* at 447. The court reasoned that

> allow[ing] a predator to use a computer to develop relationships with minor victims, so long as the ultimate consummation is first proposed through offline communication, would not serve the purpose of the enhancement. The computer-provided threat of anonymous one-to-many communications by a sexual predator exists whether the predator uses the Internet to make explicit proposals of sexual activity or merely to strike up friendships with potential victims. Either course allows the predator to contact more potential victims, and to make initial contacts more insidiously, than would be possible offline.

*Id.; see also United States v. Reaves,* 253 F.3d 1201, 1205 (10th Cir. 2001) ("Congress's concerns were not limited to a pedophile's ability to use a computer to directly contact increased numbers of children via the internet. Instead, Congress emphasized a broader concern with the ability to exploit a child's general fascination with computer technology.").

We agree with these federal courts that seducing, soliciting, luring or enticing a child goes beyond explicitly asking the child to engage in sexual relations. It is unlikely that a predator would specifically ask a child to engage in illegal sexual conduct. Instead, a pedophile is much more likely to "use a child's fascination with computer technology as a lure to drag children into sexual relationships." *Jennings,* 159 N.H. at 6 (quotation omitted). Here, the defendant did exactly that. He preyed upon A.D.'s youth and innocence to develop a relationship with her, and had the ultimate goal of consummating a sexual relationship.

The legislature's goal of protecting children from exploitation over the internet would be thwarted if an online predator was allowed to make

repeated sexual advances toward a child over the internet, so long as the perpetrator made the specific request to engage in sexual relations offline. Accordingly, given that the defendant told A.D. on several occasions that he found her attractive, repeatedly asked to meet her in person, and made several other flirtatious and sexually graphic remarks to her, a rational jury could have found him guilty of violating RSA 649-B:4.

*Affirmed.*

DALIANIS, C.J., and HICKS and CONBOY, JJ., concurred.