NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Merrimack
No. 2015-0687


THE STATE OF NEW HAMPSHIRE

v.

OWEN LABRIE

Argued: September 13, 2018
Opinion Issued: November 6, 2018


Gordon J. MacDonald, attorney general (Sean R. Locke, assistant attorney general, on the brief and orally), for the State.


Brennan, Lenehan, Iacopinio & Hickey, of Manchester (Jaye L. Rancourt and Jenna M. Bergeron on the brief, and Ms. Rancourt orally), for the defendant.


LYNN, C.J. The defendant, Owen Labrie, appeals his convictions following a jury trial in the Superior Court (Smukler, J.) on three counts of sexual assault, see RSA 632-A:4, I(c) (2016), one count of endangering the welfare of a child, see RSA 639:3, I (2016), and one count of using computer services for a prohibited purpose, see RSA 649-B:4, I(a) (2016). On appeal, the defendant challenges: (1) the sufficiency of the evidence to support his conviction under RSA 649-B:4, I(a); (2) the trial court's decision not to allow

certain cross-examination by the defendant of a State's witness; and (3) the trial court's failure to <u>sua</u> <u>sponte</u> correct statements made by the prosecutor in closing argument.  We affirm.

I

The jury could have found the following facts.[1]  In early 2014, the defendant was 18 years old and a senior at St. Paul's School (SPS), a private coeducational boarding school in Concord.  The defendant was a prefect at SPS, meaning that he served as a leader, as well as a liaison between the students and the faculty, in his dormitory.  As a prefect, the defendant had received training on the school's sexual intimacy policy, which included information regarding the New Hampshire laws concerning statutory rape.  At SPS, there was a prominent annual springtime tradition known by the students as the "senior salute," which involved a senior sending a note (or a senior salute) to a younger student on campus, inviting that younger student to spend time with the senior before he or she graduated.  Often, these notes had sexual connotations.  Although a senior salute could be an invitation simply to meet up with someone on campus, it was widely understood among SPS students that physical contact, at least in the form of a kiss, was almost always expected.  It was not unusual for the invitation to imply more advanced sexual contact as well, including sexual intercourse.

The defendant was an active participant in the senior salute tradition during his final year at SPS.  On March 23, 2014, the defendant sent the following e-mail to a friend, another male senior at SPS, with the subject line, "The coming months of slaypril and slay":  "If you ever find yourself without a tether, enjoy it while you have it.  Slaypril is approaching, and the list is starting to come into existence."

At trial, "slaypril" and "slay," as used in the subject line of the defendant's e-mail, were explained as references to the months of April and May, which marked the beginning of the senior salute season.  "Slay" was a word regularly used by students at SPS to refer to sexual penetration, including digital penetration, oral sex, and sexual intercourse.  The "list" referenced a compilation of potential female SPS students whom the defendant and his friend, the recipient of the e-mail, hoped to "spend time with" before the end of the year.  The defendant included the victim, a 15-year-old freshman at SPS, on the list.  Unlike the other names listed, he put the victim's name in all capital letters.

---

[1] We recite the facts in section I in the light most favorable to the State.  <u>See</u> <u>State v. Houghton</u>, 168 N.H. 269, 271 (2015) (stating that in evaluating a challenge to the sufficiency of the evidence, we consider all the evidence and all reasonable inferences therefrom in the light most favorable to the State).

2

Earlier in the year, on January 29, the defendant indicated to an SPS alumnus via Facebook messenger that he wanted to "pork" the victim "more than anyone," meaning that he desired to engage in sexual penetration with her, to which his friend pointed out that the victim was "really young" and inquired about her physical maturity. On March 24, 2014, the same friend asked the defendant through Facebook messenger whether he had "slain" the victim yet. On May 8, the defendant updated the list he compiled with his other friend and sent it again via e-mail. The first line in the e-mail stated "Still at large" and the updated list included, once again, the victim's name in capital letters.

On May 28, the defendant sent the victim the following senior salute via e-mail:

> [W]hile the thought of my name in your inbox makes me blush perhaps more than it should, there's something [I] want to share with you and my evenings left to do it are growing fewer by the evening. [T]here's a door here that's been locked since before we were born, but in a moment of divine intervention the night before last, its hinges swung open in my hands. [I]f you want a definition of the word bittersweet, think of me spending three years trying to open it yet now only having three nights to remember the view. [I] want to invite you to come with me, to climb these hidden steps, and to bask in the nicest view [M]illville has ever had to offer. [I] hope you're all right with heights.

> [I]f you're not otherwise engaged, mull it over. [I] ask only that you let me know soon--these days they're not making time quite like they used to.

The victim was familiar with the defendant prior to receiving this e-mail. The defendant had dated her older sister, also a senior at SPS, for about a week, and the victim and the defendant saw each other often on campus. They had danced together at school dances, and there were pictures of them together on Facebook. The defendant's roommate testified at trial that he was aware that the defendant "always had a kind of crush" on the victim.

After discussing the e-mail with her friends and her older sister, the victim decided to decline the defendant's invitation because she thought his "intentions were really, really wrong." She viewed the e-mail as "a classic senior salute letter" that the defendant had likely sent to other people, and believed that the defendant wanted to "kiss [her] or something." The victim had also heard rumors around campus, confirmed by another SPS freshman, that the defendant was involved in a competition with other senior boys to see who could rack up "numbers" and "senior salute the most girls."

3

The victim replied to the defendant, stating:

> [W]hile the thought of your name in my inbox gives me a sense of [déjà vu], ([my sister] and I are very close sisters,) and although I would like to climb those hidden steps with you, I have to decline. I would like to climb that, not the list of [freshmen] that have spent quality time with you.

The defendant responded to the victim's e-mail, stating:

> [P]robably one of the sassier emails [I]'ve ever received, my sweet lord. . . .  [I]'m afraid that list is slimmer than you might think. [P]retty much nonexistent this term, even.  [B]ut do as you please, [ma chère].  [I]'d have taken you either way.

The defendant concluded his response with song lyrics in French, which translate as "It's 2:45, . . . it's late and all the boys are dancing for you to console you, . . . their queen."

Following this exchange, the defendant asked a freshman in his dormitory who was friendly with the victim to put in a good word for him. When the freshman next saw the victim, he told her that the defendant was "a nice guy," that the defendant liked her, and that it was "not a big deal."  While speaking with the freshman, the victim changed her mind about meeting the defendant.  She testified that although she was "disgusted" by the defendant's original e-mail, the freshman approaching her made the defendant's invitation "feel more genuine," and she liked that the defendant had "taken the time . . . to seek [her] out."  The freshman messaged the defendant over Facebook to let him know, and the defendant responded, "You're a f**king dog. . . .  I will owe you 10,000 BJs and get you f**ked up the night of grad."  The freshman told the defendant that the victim said not to "gloat to her sister," and the defendant responded, "[n]o promises."

After speaking with the freshman, the victim e-mailed the defendant. Translated from French, the e-mail stated, "It's true, . . . please forgive me. Yes, only if it's our little secret."  The defendant interpreted this to mean that the victim would meet him, but only if they kept it between each other.  The defendant responded, "[W]hat a golden change of heart.  [Y]ou've saved it until the very end--there's not a lot of time but [I]'m sure we can figure something out.  [P.S.]  [Y]our French is amazing.  [N]ot a soul needs to know." Subsequently, via Facebook messenger, the two made a plan to meet.

Before leaving her dormitory to meet the defendant on May 30, the victim had a discussion with her best friend at SPS in which she laid out boundaries as to how far physically she would be willing to go with the defendant.  She said that she would probably let him digitally penetrate her, and that at most,

she would perform oral sex on him.  She stated that she would not let it go any further than that.  That same day, before leaving, the defendant told his roommate that he was going to meet the victim, to which his roommate warned him "that it probably wasn't a great idea," as the victim "was a lot younger than" they were.  Prior to meeting the victim, the defendant also sent a message to the SPS alumnus that stated, "I'm slaying [the victim]."

That evening, the victim met the defendant on campus, and the pair, at the defendant's suggestion, entered a nearby SPS building.  Once inside, the defendant led the victim to a boiler room on the top floor, and then out onto the roof.  The victim testified that she found the view from the roof "beautiful" and "wanted to stay up there," but the defendant pointed out that the roof was wet and slippery and suggested that they go back inside.  When the pair re-entered the boiler room — a dark, concrete room with loud machines — the defendant took the victim behind a wall and started to kiss her.  Shortly thereafter, the defendant placed a blanket on the ground, which he had brought with him in a backpack, and guided the victim to the floor.  The evidence indicates that although the victim held up her bra straps when the defendant attempted to remove them, twice pulled her underwear back up when the defendant tried to take them off, and stated "no, keep it up here" when the defendant lowered his head to her crotch, the defendant ultimately performed oral sex on the victim, digitally penetrated her, and engaged in sexual intercourse.

Immediately after the encounter, the victim confided in some of her friends that she thought she had had sexual intercourse with the defendant.  Her best friend suggested that the victim ask the defendant if he had worn protection during the sexual encounter.  Upon questioning from the victim over Facebook messenger, the defendant responded that he had worn a condom and asked the victim if she was taking birth control pills.  When the victim responded "[n]ope," the defendant replied, "Praise Jesus, I put it on like halfway through."  The victim then asked the defendant if he had put on the condom before or after he ejaculated.  The defendant responded, "Ha, ha, ha, I put it on long before I knew I would."  Then he said, "I would say you're good to go, but I guess it's your call."

That night and throughout the weekend, the defendant told various SPS students that he had had sexual intercourse with the victim.  In a conversation with the friend that helped him compile the list of girls, the friend asked, "How did it go from no to bone?," meaning how did it go from the victim declining the defendant's e-mail invitation to the victim and the defendant having sexual intercourse.  The defendant responded that he "just pulled every trick in the book," including oral sex.

Over the course of the next few days, after conversations with her friends and the involvement of her mother, the victim had a rape kit done at a local hospital.  Following the examination, the victim was interviewed by a detective

5

at the Child Advocacy Center and an investigation ensued. Additional facts will be addressed as necessary herein.

II

The defendant first argues that the evidence at trial was insufficient to support his conviction under RSA 649-B:4, I(a). Specifically, he asserts that the State failed to prove that when he communicated with the victim over a computer network, he intended to "seduce, solicit, lure, or entice" the victim, with the belief that she was under the age of 16, to engage in an act of sexual penetration. See RSA 649-B:4, I(a).

Because a challenge to the sufficiency of the evidence raises a claim of legal error, our standard of review is de novo. State v. Kay, 162 N.H 237, 243 (2011). In reviewing a sufficiency of the evidence claim, we view the evidence presented at trial, and all reasonable inferences drawn therefrom, in the light most favorable to the State, and uphold the jury's verdict unless no rational trier of fact could have found guilt beyond a reasonable doubt. State v. Lisasuain, 167 N.H. 719, 722 (2015). In doing so, we examine each evidentiary item in the context of all the evidence, not in isolation. State v. Kelley, 159 N.H. 449, 455 (2009). The defendant bears the burden of demonstrating that the evidence was insufficient to prove guilt. State v. Boutin, 168 N.H. 623, 627 (2016).

According to the defendant, to prove the statute's requisite intent under RSA 649-B:4, I(a), the State needed to present at trial either evidence of sexual content or evidence of deception in the defendant's computer communications to the victim. RSA 649-B:4, I(a) provides:

> No person shall knowingly utilize a computer on-line service, internet service, or local bulletin board service to seduce, solicit, lure, or entice a child or another person believed by the person to be a child, to commit any of the following:
>
> (a) Any offense under RSA 632–A, relative to sexual assault and related offenses.

Given the plain language of the statute and our prior case law interpreting it, we do not agree with the defendant's construction of the statute.[2]

---

[2] At oral argument, there was discussion about the fact that the jury had not received an instruction from the trial court on the definitions of "seduce, solicit, lure, or entice." The defendant, however, did not raise a jury instruction argument on appeal or object to the jury instructions at trial, and thus this issue is not before us. Regardless, because we have adopted the plain and ordinary meaning of these words, there was no requirement for a jury instruction by the trial court. See State v. Farrington, 161 N.H. 440, 446 (2011).

6

When interpreting a statute, we first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning. State v. Serpa, 170 N.H. 781, 784 (2018). We are the final arbiters of the legislative intent as expressed in the words of the statute considered as a whole. Farrington, 161 N.H. at 445. We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include. Serpa, 170 N.H. at 784. We review the trial court's interpretation of a statute de novo. State v. Jennings, 159 N.H. 1, 3 (2009).

In Farrington, we explained that the term "solicit," as used in the statute means:

> to make petition to: ENTREAT . . . to approach with a request or a plea . . . to move to action: serve as an urge or incentive . . . to strongly urge . . . insist upon . . . to entice or lead astray by or as if by specious arguments: lure on and especially into evil . . . to endeavor to obtain by asking or pleading: plead for . . . to seek eagerly or actively . . . to have an effect on (a person or thing) through some natural influence or property . . . to seek to affect . . . to serve as a temptation or lure to: ATTRACT.

Id. at 446-47 (quotation omitted). "Lure" means: "to tempt with a promise of pleasure or gain: ALLURE, ATTRACT, ENTICE, INVITE," and "entice" includes: "to draw on by arousing hope or desire: ALLURE, ATTRACT . . . to draw into evil ways: lead astray: TEMPT." Id. at 447 (emphasis added; quotations omitted). Although we have yet to define "seduce," its meaning includes the following: "to persuade into disobedience . . . to persuade or entice astray in action or belief . . . to persuade or entice into partnership in sexual intercourse . . . to induce or force to come or go . . . to attract or gain by or as if by quiet subtle charm." Webster's Third New International Dictionary 2054 (unabridged ed. 2002).

The defendant argues that his actions do not fall under RSA 649-B:4, I(a) because he did nothing more than communicate over a computer network with a social acquaintance, without deception (because the two were acquainted) and without communicating any sexual content (because the defendant did not send any sexual imagery or other sexual content, and did not explicitly request sexual contact). In support of his argument, the defendant claims that our accepted definitions of "seduce," "solicit," "lure," and "entice" involve the intent to "draw" the victim into "evil ways," and that those evil ways involve sexual conduct. Accordingly, the defendant asserts that if there is no sexual content sent through the messages or explicit mention of sexual conduct in the messages themselves, there is no evidence of the intent to draw the victim into sexual conduct. This narrow interpretation is not supported by the plain language of the statute or by our case law.

7

First, the plain language of the statute does not put any limitation on the substance of the communications between the defendant and the child, and we decline to consider what the legislature might have said or add language to the statute that the legislature did not see fit to include. See Jennings, 159 N.H. at 4. Second, in Jennings, we upheld a conviction under the statute where the computer use at issue was targeted at an individual with whom the defendant had a preexisting relationship, there a familial one. Id. at 2-3. Third, we stated in Farrington that the plain language of RSA 649-B:4 does not require an explicit or affirmative request for sexual contact. See Farrington, 161 N.H. at 447. We draw the same conclusion here. Nowhere in the plain and ordinary meaning of the statute do we discern any requirement that the defendant must send explicit sexual content to the victim or affirmatively ask the victim to engage in sexual penetration. See id. As we said in Farrington, while the definitions of "seduce," "solicit," "lure," and "entice" all have "the common theme of tempting, attracting or leading someone astray," the jury here could have found "that the defendant intended his communication to attract, tempt or invite" the victim. Farrington, 161 N.H. at 447.[3]

At trial, the State presented ample evidence of the defendant's active participation in the senior salute, as well as his pursuit of the victim as a much-desired conquest. Testimony revealed that the defendant was involved in a competition on campus in which senior males were vying to see who could "senior salute," or have sexual contact with, the most females. In March 2014, in anticipation of the senior salute season, the defendant sent an e-mail to a friend with the subject line: "The coming months of slaypril and slay." He then worked with that friend to compile a list of names of SPS girls they wanted to "spend time with," including the victim's name on that list in all capital letters to distinguish her name from the others listed. As the end of the year drew closer, the defendant re-sent the list via e-mail, with the first line stating "Still at large" and the victim's name included, once again, in all capital letters. While the defendant and the victim were not close friends, testimony at trial established that the defendant "always had a kind of crush" on the victim. In addition, in messages to an alumnus in January 2014, months before the senior salute, the defendant told his friend that he wanted to "pork" the victim "more than anyone."

In reviewing an insufficiency claim, we look at the evidence in its totality and not in isolation. Kelley, 159 N.H. at 455. The defendant's actions prior to, during, and after his encounter with the victim support the jury's finding of the requisite intent at the time he sent the computer communications. To persuade the victim to reconsider her initial declination, the defendant

---

[3] The defendant also asks us to invoke the rule of lenity. Because we apply the plain and ordinary meaning of the statute, we need not consider the rule of lenity. See State v. Brooks, 164 N.H. 272, 292 (2012) (stating that the "rule of lenity serves as a guide for interpreting criminal statutes where the legislature failed to articulate its intent unambiguously" (quotation omitted)).

8

convinced a friend of the victim's to put in a good word for him; a request that exhibited the defendant's persistence in pursuing the victim. Prior to meeting up with the victim on May 30, 2014, the defendant sent a Facebook message to his friend in which he announced, "I'm slaying" the victim, indicating that he was about to engage in sexual penetration with the victim. He then guided the victim to a secluded room on campus where it was unlikely they would be interrupted. The defendant also brought a blanket and a condom to the outing — further evidence of his intent to have sexual intercourse with the victim — both of which he ended up using. Indeed, the defendant did have sexual intercourse with the victim that night. In addition, the defendant's intent is evidenced by a conversation he had with his friend over Facebook messenger following the incident, in which his friend asked him how the defendant caused the victim to "go from no to bone," and the defendant responded that he "pulled every trick in the book," including oral sex.

We conclude that in formulating his argument, the defendant focuses on the initial e-mail communication he sent to the victim, rather than any of the subsequent e-mail and Facebook communications to the victim leading up to the incident. Regardless of whether we analyze each pre-encounter communication individually, or consider them collectively, however, the result is the same. There was ample evidence of the defendant's intent to "solicit, seduce, lure, or entice" the victim to engage in sexual penetration throughout early 2014. Thus, the evidence was sufficient to support the defendant's conviction under RSA 649-B:4, I(a).

III

We next consider the defendant's challenge to the trial court's ruling with respect to his cross-examination of a friend of the defendant who was called as a witness for the State on the fourth day of trial. On cross-examination, after establishing that the friend had graduated from SPS in 2014, defense counsel asked him: "And while you were there, you got to know a woman . . . , didn't you?" The State objected, arguing that the evidence was irrelevant and improper character evidence. In response, defense counsel explained that he was offering the witness's testimony to "show the[] potential bias and prejudice of the witness in favor of the Concord Police." Defense counsel proffered that he expected the evidence to show that the witness had dated a 15-year-old student at SPS and that the child's mother had discovered Facebook messages between the witness and her daughter that led her to believe that the two had had sexual intercourse. According to defense counsel, the mother initially wanted an investigation by the Concord Police, but ultimately the matter was resolved between SPS and the students' families. Defense counsel argued that the alleged conduct was "the same crime that the [d]efendant here is charged with." Defense counsel also stated that at the time the witness spoke with the Concord Police regarding the investigation surrounding the defendant, he had "an incentive to be especially cooperative in giving the police what they

9

wanted," given the desire of the girl's mother to report his alleged behavior to the Concord Police.

The trial court initially sustained the State's objection, stating that it did not "see the probative value of these connections," and that it was "not getting the connection in terms of bias not to tell the truth." Following trial that day, however, the court held a chambers conference wherein it informed the parties that it "make[s] rulings fast because [it] ha[s] to on the bench," and that it was "concerned that [it] may have ruled a little too quickly with respect to the issue" of cross-examination. The court explained that "on reflection," it thought there could be "something there that, if sanitized, . . . counsel could . . . be given an opportunity to explore." The State then offered that it understood "that there was no crime that occurred" between the witness and the child, and that the only thing that happened between them was "that they kissed and hugged." In response, the defendant expressed that he wanted to "revisit this tomorrow" because he wanted the chance to speak with the witness's attorney. The trial court responded that that was fine, and that it would give defense counsel "an opportunity to recall" and "correct" the court on whether the witness was predisposed to tell the police what they wanted to hear. The court added, "I'm not going to require you to answer now if you want to revisit it, but . . . if the underlying factual foundation . . . is there . . . and it's sanitized, I may allow you to recall. But I think I need to develop the factual foundation a little bit more." Defense counsel responded, "I'm going to try to do that because . . . I believe now I have an avenue to speak to [the witness's attorney]. . . . I take the burden on myself to bring the matter to your attention again." Defense counsel did not, however, raise the issue again prior to the conclusion of the trial.

On appeal, the defendant argues that the trial court erred in not permitting contemporaneous cross-examination of the State's witness regarding his bias and motive to be untruthful, in violation of the defendant's confrontation rights under the State and Federal Constitutions. See N.H. CONST. pt. I, art. 15; U.S. CONST. amend. VI. "The right to confrontation may, of course, be waived," however, and the defendant did so here. Melendez-Diaz v. Massachusetts, 557 U.S. 305, 314 n.3 (2009).

The trial court considered the admissibility of the proffered testimony and made an initial decision to exclude it. After further contemplation, however, the trial court reconsidered its decision sua sponte and informed the parties that, if the circumstances posited in the original offer of proof were accurate, it was open to allowing the witness to be recalled so that the cross-examination could occur. Defense counsel responded by "tak[ing] the burden on [him]self to bring the matter to [the court's] attention again." The defendant's subsequent failure to supplement his offer of proof or seek to recall the State's witness amounted to an abandonment of his right to confrontation.

10

See United States v. Soto, 799 F.3d 68, 96 (1st Cir. 2015) ("A party's considered decision not to avail itself of a procedural right . . . waives that right." (quotation omitted)).

In arguing against waiver, the defendant quotes Brookhart v. Janis, 384 U.S. 1 (1966), stating that "[t]here is a presumption against the waiver of constitutional rights, . . . and for the waiver to be effective it must be clearly established that there was an intentional relinquishment or abandonment of a known right or privilege." Id. at 4 (quotation omitted). However, the United States Supreme Court later recognized that even "the most basic rights of criminal defendants are subject to waiver," and that although some of these fundamental rights — such as the right to counsel and the right not to plead guilty — may only be waived by the defendant, others may be waived by the action of defense counsel, who has the "full authority to manage the conduct of the trial." New York v. Hill, 528 U.S. 110, 114-15 (2000) (quotation and brackets omitted). Decisions by counsel that pertain to the conduct of trial, and thus bind the defendant "by the acts of his lawyer," include "what arguments to pursue, . . . what evidentiary objections to raise, . . . and what agreements to conclude regarding the admission of evidence." Id. at 115 (quotations and citations omitted). Thus, defense counsel's decision not to confront the State's witness constituted a waiver by which the defendant was bound. Id.; see also United States v. Casey, 825 F.3d 1, 26 (1st Cir. 2016) (holding that defendant's constitutional right to confrontation was waived via counsel).

The defendant contends that the "damage [was] done" when the trial court sustained the State's initial objection. As the trial court explained during the chambers conference, however, it is the role of the trial court to rule from the bench, and thus it is within the trial court's purview whether to revisit an issue that it believes it may have "ruled [on] a little too quickly." The trial court presented defense counsel with a second opportunity to put the testimony before the jury, and defense counsel voluntarily assumed the responsibility to re-raise the issue. When counsel failed to do so, he waived the defendant's right to advance this argument on appeal.[4]

IV

Lastly, we address the defendant's challenge to the State's closing argument. During the State's closing argument, the prosecutor stated the following:

---

[4] Pending before us is the State's motion to strike portions of the defendant's brief and appendix. Because in finding the defendant's argument waived we have not relied on the portions of the defendant's brief and appendix contested by the State, the State's motion to strike is moot. See Lovejoy v. Linehan, 161 N.H. 483, 490 (2011).

11

[I]n this case, you have so much more than just [the victim's] testimony and the [d]efendant's statements. You have semen and sperm found on the inside of her underwear. And understand, there's no DNA evidence to definitively say the semen and sperm came from [the defendant], but you heard the testimony, there was no one else there to put semen or sperm on the inside of her underwear.

And I want to address two things that you heard during trial. First, the sperm didn't seep through the underwear. [The first criminalist] told you, the first thing he did with the underwear when he got it was to examine it with an alternate light source. He examined it in search for semen with a fluorescent light. It wasn't on the outside of the underwear, it was only in one place, the interior crotch panel. There is no logical way to explain how semen got in the interior crotch panel of her underwear unless it involves a penis in her underwear or semen in her vagina.

. . . .

You also have [the defendant's] DNA profile on the interior crotch panel of [the victim's] underwear. It's not semen, it's not sperm, but it's without a question [the defendant].

On appeal, the defendant argues that the State misstated the biological and DNA evidence presented at trial in a manner that was so egregious as to warrant a <u>sua</u> <u>sponte</u> interjection by the trial court to correct the misrepresentation. The defendant asserts that in failing to do so, the trial court plainly erred.

Because the defendant failed to object to the State's closing argument, our review is for plain error. <u>See</u> <u>State v. Drown</u>, 170 N.H. 788, 792 (2018); <u>Sup. Ct. R.</u> 16-A. We use the plain error rule sparingly, limiting its application to those circumstances in which a miscarriage of justice would otherwise result. <u>Drown</u>, 170 N.H. at 792. For us to find plain error: (1) there must be an error; (2) the error must be plain; (3) the error must affect substantial rights; and (4) the error must seriously affect the fairness, integrity, or public reputation of judicial proceedings. <u>Id</u>.

The defendant claims that the prosecutor misstated the evidence when he stated that semen and sperm had been found on the <u>inside</u> or <u>interior</u> crotch panel of the victim's underwear. He asserts that the evidence presented by the State's witnesses established only that there was semen and possibly other fluids <u>somewhere</u> on the crotch panel, not necessarily on the inside. In addition, he argues that the prosecutor's statements that "the sperm didn't seep through the underwear" and that "[t]here is no logical way to explain how

12

semen got in the interior crotch panel of [the] underwear unless it involves a penis in her underwear or semen in her vagina," were contrary to the testimony of the State criminalist that cells in bodily fluids can seep through fabric, depending on the pores of the specific fabric.

Recently, in Drown, we held, under plain error review, that the trial court did not err in failing to sua sponte interrupt the State's closing argument. Id. at 801. In doing so, we emphasized the role of defense counsel in objecting to statements made by the opposing party during argument. See id. at 801-02. A decision not to object may be a trial strategy that should not be intruded upon by the trial court in the absence of patently egregious circumstances. Indeed, as the State points out, we have often discouraged trial courts from acting sua sponte. See, e.g., State v. Noucas, 165 N.H. 146, 161 (2013) ("We have never held that a trial court must sua sponte strike or issue a curative instruction with respect to witness testimony. Indeed, . . . we have suggested that courts should refrain from taking such action."); State v. King, 146 N.H. 717, 722 (2001) (holding it was error for the trial court to sua sponte assert the privilege against self-incrimination on witness's behalf). Likewise, in Drown, we stated that the decision not to object at closing argument may have stemmed from a conclusion that the prosecutor's statements were "nonsensical and would be seen as such by the jury, and thus undermine the force of the message that the prosecutor was attempting to convey." Drown, 170 N.H. at 802. Although the misstatements at issue here are not "nonsensical" as were those at issue in Drown, they also were not so egregious as to impose upon the trial court an obligation to intervene. See id. On the contrary, we conclude that any misstatements of the evidence by the prosecutor as to the exact location of semen or sperm found on the victim's underwear would have been cured by the trial court's jury instructions, given both at the outset of trial and after the close of evidence, that the lawyers' "arguments are not evidence." State v. Littlefield, 152 N.H. 331, 348 (2005) ("The jury is presumed to follow the instructions given by the trial court."). Furthermore, although, in his trial testimony, the defendant denied having sexual intercourse with the victim, given the other overwhelming evidence of the defendant's guilt, including his post-encounter conversations with the victim and others, in which he acknowledged having sexual intercourse with the victim, the defendant cannot demonstrate that any error by the trial court in failing to take sua sponte action to cure the prosecutor's misstatements affected his substantial rights.

Affirmed.

HANTZ MARCONI, J., concurred; TUCKER, J., superior court justice, specially assigned under RSA 490:3, concurred.

13