NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Hillsborough-northern judicial district
No. 2017-0361


THE STATE OF NEW HAMPSHIRE

v.

ADRIEN STILLWELL

Argued: June 6, 2019
Opinion Issued: September 18, 2019


Gordon J. MacDonald, attorney general (Lisa L. Wolford, senior assistant attorney general, on the brief and orally), for the State.


Eric S. Wolpin, assistant appellate defender, of Concord, on the brief, and Christopher M. Johnson, chief appellate defender, orally, for the defendant.


BASSETT, J. Following a jury trial, the defendant, Adrien Stillwell, was convicted on one count of first degree murder, see RSA 630:1-a, I(a) (2016), one count of second degree murder, see RSA 630:1-b (2016), and one count of conspiracy to commit murder, see RSA 629:3 (2016); RSA 630:1-a, I(a). On appeal, he argues that the Superior Court (Brown, J.) erred by: (1) allowing an expert to testify in violation of the Confrontation Clause of the Sixth Amendment to the United States Constitution; (2) admitting the out-of-court

statements of an unavailable witness under the statement against penal interest exception to the hearsay rule; and (3) failing to take sua sponte action to address the allegedly improper statements made by the prosecutor during the State's closing argument. We affirm.

I. Facts

The jury could have found the following facts. On October 21, 2015, Paulson Papillon sold drugs to M.P. and to a confidential informant. Shortly thereafter, police arrested and jailed Papillon for selling drugs to the informant. After Papillon was released, and believing that M.P. was a "snitch" and responsible for his arrest, Papillon offered a bounty for M.P.'s death. Papillon subsequently met with the defendant, Nathanial Smith, and Michael Younge on multiple occasions and discussed killing M.P.

On November 3, 2015, the defendant and Smith went to a convenience store, where video surveillance shows that they met Younge. They then headed to M.P.'s apartment building, where the defendant shot and killed M.P. Shortly thereafter, a neighbor, who had heard "loud bangs" and her trash barrel falling over, found a gun when picking up the trash barrel. The gun contained six spent cartridges. Forensic testing established that a bullet recovered from the victim's body had been fired from the gun. A New Hampshire State Police Forensic Laboratory employee subsequently swabbed the gun for DNA.

On November 16, 2015, police executed a body warrant on the defendant at the police department in Manchester, and took a buccal swab of the inside of his mouth for use as a "known sample" for comparison to other evidence. After police executed the body warrant, the defendant waived his Miranda rights and spoke with police for approximately forty-five minutes in a recorded interview. See Miranda v. Arizona, 384 U.S. 436, 444, 479 (1966). The defendant stated that he had not been present at, and did not know about, M.P.'s murder.

After his arrest, the defendant shared a jail cell with Scott Collier. The defendant told Collier that he had killed M.P., and shared details as to what happened on November 3, 2015 that had not been included in news reports. During a second interview with police, the defendant again denied being involved with M.P.'s murder, and denied knowing Papillon, Smith, or Younge. The defendant, Younge, Smith, and Papillon were subsequently indicted for first degree murder and conspiracy to commit murder.

In December 2015, DNA swabs from the gun, along with buccal swabs from the defendant, Smith, and Younge, were sent to NMS Labs in Pennsylvania. NMS Labs generated DNA data from each swab and sent the machine-generated raw data to another company, Cybergenetics. Cybergenetics initially determined that there was DNA from four or five people on the gun. An expert at Cybergenetics, Mark Perlin, Ph.D., M.D., Ph.D., used

a computer technology called TrueAllele to determine whether there was a match between the DNA on the gun and the DNA of Smith, Younge, or the defendant. He concluded that a "match between the gun and [the defendant] was 88.4 trillion times more probable than a coincidental match to an unrelated . . . African American person," and that there was no support for a positive match between Smith or Younge and the gun.

Prior to the defendant's trial, Smith and Younge reached cooperation agreements with the State pursuant to which they agreed to testify against the defendant. At trial, Younge testified that the defendant "took a stance" and "aimed" before shooting the victim. Smith testified that after the victim was shot and everyone ran away, knocking over trash barrels in the process, he met the defendant, Younge, and Papillon, and the defendant confirmed that he had shot M.P. Papillon did not testify at trial, but statements that he made to his sister on a recorded telephone call from the New Hampshire State Prison were admitted into evidence under the statement against penal interest exception to the hearsay rule. These statements included assertions by Papillon that Younge was not the shooter, and expressions of concern that one of the others involved in the shooting might say that he, Papillon, "sent the guys to go kill [M.P.]." Although the defendant did not testify, statements that he made in a recorded telephone call from jail, including statements that he was at the murder scene at the time of the shooting and that he knew Younge was cooperating with police, were admitted. In addition, Perlin testified during the State's case that, using the TrueAllele computer technology, he was able to determine that there was a match between the DNA found on the gun and the defendant's DNA. The jury convicted the defendant on all charges. This appeal followed.

## II. Confrontation Clause

The defendant first argues that he was denied his right to confront witnesses against him as guaranteed by the Sixth Amendment to the Federal Constitution when Perlin, the State's expert, presented machine-generated raw DNA data to the jury, and testified that certain DNA profile data came from the defendant's sample and other DNA profile data came from the gun. The defendant asserts that this testimony was inadmissible because Perlin was not involved in generating the DNA data; therefore, he lacked personal knowledge as to which data resulted from the testing of which sample. The State responds that Perlin's expert testimony did not violate the defendant's confrontation rights because the raw DNA data was generated by a computer, and is, therefore, non-testimonial for purposes of the Confrontation Clause. The State further contends that the requirements of the Confrontation Clause are satisfied so long as an expert testifies about his or her own independent judgment, even if that judgment was based on inadmissible testimonial hearsay. See State v. McLeod, 165 N.H. 42, 53 (2013). We review Confrontation Clause challenges de novo. Id. at 47.

3

The Sixth Amendment's Confrontation Clause provides that "the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. The United States Supreme Court has held that this right allows the State to admit against a defendant the "testimonial statements" of an absent witness only when the witness is unavailable to testify and the defendant had a prior opportunity to cross-examine the witness. See Crawford v. Washington, 541 U.S. 36, 59, 68-69 (2004). The Supreme Court defined "testimony" as, typically, "a solemn declaration or affirmation made for the purpose of establishing or proving some fact." Id. at 51 (quotation and brackets omitted). Although Crawford did not identify a definitive class of testimonial statements, the Supreme Court did identify "[v]arious formulations" that comprise the core of testimonial hearsay, which generally include the following:

> ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; [and] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

Id. at 51-52 (quotations, ellipsis, and citations omitted). The Supreme Court subsequently considered whether scientific reports are testimonial statements in Melendez-Diaz v. Massachusetts, 557 U.S. 305, 308-11 (2009), Bullcoming v. New Mexico, 564 U.S. 647, 651-52 (2011), and Williams v. Illinois, 567 U.S. 50, 65-67 (2012) (plurality opinion). We recently discussed these cases in State v. Watson, 170 N.H. 720, 728-33 (2018); here, we briefly summarize our analysis.

In Melendez-Diaz, the Supreme Court held that certificates of analysis from a forensic laboratory that tested a substance found in connection with the defendant's arrest were testimonial. Melendez-Diaz, 557 U.S. at 308, 310-11. The Court compared the certificates to live testimony because they were "quite plainly affidavits," and did "'precisely what a witness does on direct examination.'" Id. at 310-11 (quoting Davis v. Washington, 547 U.S. 813, 830 (2006)). Since the certificates of analysis were made to establish or prove a fact — "that the substance found in the possession of Melendez-Diaz . . . was, as the prosecution claimed, cocaine" — the Court held they could not be introduced unless the authors of the certificates were subject to cross-examination. Id. However, the Court also noted "it is not the case[] that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case." Id. at 311 n.1.

4

Similarly, in Bullcoming, the Court held that the Confrontation Clause did not permit the prosecution to introduce a "forensic laboratory report containing a testimonial certification — made for the purpose of proving a particular fact — through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification." Bullcoming, 564 U.S. at 652. The Court noted that the document "reported more than a machine-generated number," and included a certification that a blood sample had been received intact with the seal unbroken, that the forensic report number and the sample number corresponded, information about the manner in which the non-testifying analyst conducted testing, the "integrity of the sample," and the "validity of the analysis." Id. at 659-60 (quotations omitted). The Court reasoned that "[t]hese representations, relating to past events and human actions not revealed in raw, machine-produced data, are meet for cross-examination." Id. at 660.

Justice Sotomayor wrote a separate concurring opinion, emphasizing "the limited reach" of the majority opinion, and "highlight[ing] some of the factual circumstances that [Bullcoming] does not present." Id. at 668, 672 (Sotomayor, J., concurring). She observed:

> [T]his is not a case in which an expert witness was asked for his independent opinion about underlying testimonial reports that were not themselves admitted into evidence. [The testifying scientist did not] offer[] an independent, expert opinion about [the defendant's] blood alcohol concentration. . . . We would face a different question if asked to determine the constitutionality of allowing an expert witness to discuss others' testimonial statements if the testimonial statements were not themselves admitted as evidence.
>
> Finally, this is not a case in which the State introduced only machine-generated results . . . . The State here introduced [the certifying scientist's] statements, which included his transcription of a blood alcohol concentration, apparently copied from a gas chromatograph printout, along with other statements about the procedures used in handling the blood sample. Thus, we do not decide whether . . . a State could introduce (assuming an adequate chain of custody foundation) raw data generated by a machine in conjunction with the testimony of an expert witness.
>
> This case does not present, and thus the Court's opinion does not address, any of these factual scenarios.

Id. at 673-74 (citations omitted).

5

Most recently, in Williams, the Court considered whether the Confrontation Clause precluded an expert from testifying at trial that a DNA profile contained in a forensic report produced by an outside laboratory — which lacked an attestation or certification from the non-testifying witness — matched a DNA profile produced by a state police lab using a sample of the alleged assailant's blood. Williams, 567 U.S. at 56, 59, 111-12. The case resulted in a 4-1-4 division of the Justices, with each of the opinions "embrac[ing] a different approach to determining whether the use of forensic evidence violates the Confrontation Clause." Watson, 170 N.H. at 733 (quotation omitted). Therefore, we concluded, as have other courts, that its "force, as precedent, is at best unclear." Id. (quotation and brackets omitted); see also United States v. James, 712 F.3d 79, 95 (2d Cir. 2013) (concluding that because "[n]o single rationale disposing of the Williams case enjoys the support of a majority of the Justices" and because the case "does not . . . yield a single, useful holding," it is "confined to the particular set of facts presented in that case"); United States v. Turner, 709 F.3d 1187, 1189 (7th Cir. 2013) (observing that because of "the 4-1-4 division of the Justices . . . , with one Justice — Justice Thomas — concurring in the result but no portion of the plurality's reasoning, . . . it [is] somewhat challenging to apply Williams" (footnote omitted)).

In McLeod, we analyzed one of the factual scenarios left unresolved by the Court: the constitutionality of an expert witness rendering an independent opinion based upon underlying testimonial statements. McLeod, 165 N.H. at 51; see also Bullcoming, 564 U.S. at 673. We held that a defendant's "confrontation rights would be violated were the State permitted to introduce [a non-testifying witness's testimonial statements] through the direct examination of its experts." McLeod, 165 N.H. at 49. However, we held that the Confrontation Clause does not prohibit experts, applying their own knowledge to the facts before them, from testifying regarding their opinions, provided that "they do not testify as to [the non-testifying witness's] statements on direct examination." McLeod, 165 N.H. at 55. Such expert testimony is permissible, we explained, because the experts are "not acting as mere 'transmitters' of testimonial statements of others," but rather are "true experts whose considered opinions shed light on a specialized factual situation." Id. (quotations and brackets omitted).

McLeod is in accord with the reasoning of courts in other jurisdictions. See, e.g., United States v. Ramos-González, 664 F.3d 1, 5 (1st Cir. 2011) (concluding that "the assessment is one of degree. Where an expert witness employs her training and experience to forge an independent conclusion, albeit on the basis of inadmissible evidence, the likelihood of a Sixth Amendment infraction is minimal."); United States v. Williams, 740 F. Supp. 2d 4, 10 (D.D.C. 2010) (holding that an expert may testify to "independent judgment" that is "reached by application of [the expert's] training and experience to the sources before him" (quotations omitted)). "The question is whether the expert

6

is, in essence, giving an independent judgment or merely acting as a transmitter for testimonial hearsay." United States v. Johnson, 587 F.3d 625, 635 (4th Cir. 2009). "As long as he is applying his training and experience to the sources before him and reaching an independent judgment, there will typically be no Crawford problem" because "[t]he expert's opinion will be an original product that can be tested through cross-examination." Id.

We have not yet had occasion to address the issue of whether machine-generated raw data, or information identifying the source of the data, are testimonial statements. With this in mind, we turn to the defendant's argument that his confrontation rights were violated when Perlin presented machine-generated raw DNA data to the jury, and when he testified that certain DNA profile data came from the defendant's sample and other DNA profile data came from the gun.

Before Perlin testified as to his expert opinion, the State elicited testimony from a police officer from the City of Manchester who testified that he was present on November 16, 2015 when a detective took a buccal swab of the inside of the defendant's mouth. He testified that sterile procedures were followed when taking the "known sample" of the defendant's DNA, and that the swab was then sealed and labeled. An employee from the New Hampshire State Police Forensic Laboratory then testified that she swabbed the gun at issue in this case for DNA, packaged the swabs for mailing, labeled the swabs with a computer-generated barcode, and mailed the gun swabs — along with buccal swabs from the defendant, Smith, and Younge — to NMS Labs. She requested that the lab compare the DNA from the gun swabs with the DNA from the three known samples.

Perlin testified that he received genetic data from NMS Labs and analyzed it using TrueAllele, a probabilistic genotyping software that he designed and programmed. He explained that TrueAllele separates the genotypes when a particular sample includes DNA from two or more people. "[T]he computer unmixes the mixture," and "afterwards comparisons can be made to reference profiles or reference genotypes from different individuals to determine the extent of the match." He testified that when the data from the three reference samples was compared to the gun swabs, he was able to generate a match statistic between the samples. He stated that his "overall finding[]" was "that a match between the gun and [the defendant] was 88.4 trillion times more probable than a coincidental match. And when comparison was made with the other two individuals . . . we found that there was no support for a positive match." He also asserted that the "chance of a false positive error for the match statistic between the gun and [the defendant] . . . was about 1 in 63 quadrillion."

During his testimony, Perlin utilized a PowerPoint presentation to explain how the TrueAllele program uses the raw DNA data to determine the likelihood

7

that a particular individual's DNA was included in the target sample. Some PowerPoint slides included the machine-generated raw DNA data from NMS Labs. The defendant did not object at any point during Perlin's testimony. No one from NMS Labs testified.

On appeal, the defendant argues that Perlin's testimony violated the Confrontation Clause because it included two kinds of inadmissible testimonial statements. He first argues that the machine-generated raw data itself constitutes a testimonial statement; he asserts, therefore, that his confrontation rights were violated when Perlin included that data in a PowerPoint slide that was published to the jury. Second, he contends that the attribution of a particular DNA sample to a particular swab is a testimonial statement. Accordingly, he argues that his confrontation rights were violated when Perlin, who had no personal knowledge that particular data resulted from the testing of a particular swab, told the jury that one DNA profile was the defendant's, and that another DNA profile came from the gun. The defendant contends that "[w]hen Perlin told the jury that a data profile <u>was</u> [the defendant's] DNA, [he] was reciting [a NMS Labs analyst's] out-of-court assertion that a specified data set arose from the testing of [the defendant's] buccal swab." He argues that an NMS Labs analyst "could have testified to that fact — and been subject to the Confrontation Clause's guarantee of cross-examination — but Perlin could not."

We now consider the defendant's argument that Perlin's testimony violated the defendant's confrontation rights because he presented machine-generated raw data to the jury through charts in his PowerPoint slides. The defendant contends that Perlin's testimony violates our holding in <u>McLeod</u> that, although an expert can, consistent with the Confrontation Clause, testify on direct examination that he "relied upon witness statements," <u>McLeod</u>, 165 N.H. at 55, the expert may not disclose the out-of-court statements to the jury through direct examination. <u>Id</u>. at 49. We disagree.

The threshold question for Confrontation Clause claims is whether the challenged statement is testimonial. <u>See</u> <u>Davis</u>, 547 U.S. at 821. We review whether a statement is testimonial <u>de novo</u>. <u>State v. Dilboy</u>, 163 N.H. 760, 766 (2012). If a statement is not testimonial, "the Confrontation Clause has no application." <u>Id</u>. at 764.

The Supreme Court has not yet addressed whether machine-generated raw data is a testimonial statement when the data contains no attestation from the operator. However, those courts that have addressed the issue have almost uniformly concluded that raw data generated by a laboratory machine is not a testimonial statement of the lab technician who operated the machine. <u>See, e.g.</u>, <u>United States v. Summers</u>, 666 F.3d 192, 202 (4th Cir. 2011) (holding that the "numerical identifiers of the DNA allele here, insofar as they are nothing more than raw data produced by a machine," are not testimonial in nature);

8

United States v. Moon 512 F.3d 359, 362 (7th Cir. 2008) ("[T]he instruments' readouts are not 'statements,' so it does not matter whether they are 'testimonial.'"); People v. Lopez, 286 P.3d 469, 478 (Cal. 2012) (holding that "machine-generated printouts . . . did not implicate the Sixth Amendment's right to confrontation"); State v. Buckland, 96 A.3d 1163, 1172 (Conn. 2014) (holding that "machine generated data is not subject to the restrictions imposed by Crawford, Melendez-Diaz and Bullcoming"). But see Young v. United States, 63 A.3d 1033, 1046 (D.C. 2013) (holding that machine-generated raw data, including a DNA profile, can be a testimonial statement if human judgment or subjectivity was a necessary component of the data's generation).

As the Fourth Circuit Court of Appeals has explained, a lab technician who operates a machine could not independently affirm or deny that a blood sample contains a particular characteristic because the technician "would only be able to refer to the machine's printouts." United States v. Washington, 498 F.3d 225, 230 (4th Cir. 2007). Therefore, "[t]he raw data generated by the diagnostic machines are the 'statements' of the machines themselves, not their operators." Id. "[U]nlike a person, a machine cannot be cross-examined . . . ." Lopez, 286 P.3d at 478. We are persuaded by this reasoning and conclude that the machine-generated raw DNA profile data that Perlin included in his PowerPoint presentation is not a testimonial statement of the NMS Labs analyst who operated the machine. Accordingly, we hold that Perlin's inclusion of that raw DNA data in his PowerPoint presentation to the jury did not violate the defendant's confrontation rights.

We are not unmindful that machine-generated raw data can give rise to legitimate evidentiary concerns: "A machine might malfunction, produce inconsistent results or have been tampered with." United States v. Lizarraga-Tirado, 789 F.3d 1107, 1110 (9th Cir. 2015). However, "concerns about the reliability of such machine-generated information [are] addressed through the process of authentication not by hearsay or Confrontation Clause analysis." Washington, 498 F.3d at 231. Here, the defendant's appellate arguments regarding the raw data are of a constitutional dimension: he does not make arguments concerning the reliability of the data, the methods used to derive it, authentication, or the chain of custody.

We now turn to the defendant's second Confrontation Clause argument: that Perlin's testimony violated the defendant's confrontation rights because Perlin — who had no personal knowledge that particular data resulted from the testing of a particular swab — impermissibly repeated to the jury, and "affirmed as true," the NMS Labs analyst's "testimonial statements attributing particular DNA data to a particular swab." The defendant argues that, although it would have been consonant with our holding in McLeod for Perlin to testify that he reviewed DNA data and that "it was his opinion that a DNA profile was included in a mixed DNA sample with a certainty of 88.4 trillion to

9

one, and that it was his opinion that two other profiles were excluded from the mixture," Perlin's actual testimony on direct examination — attributing the DNA data to a specific source — violated the defendant's confrontation rights. See McLeod, 165 N.H. at 55 (an expert can testify that he "relied upon witness statements," as long as he "do[es] not testify as to [the actual] statements on direct examination"). We are presented, therefore, with a narrow issue that we have not previously had occasion to consider: Whether the attribution associated with machine-generated raw data that identifies the source of the data is a testimonial statement of the lab analyst who operated the machine generating that data, even though the raw data itself is not.

To properly analyze whether Perlin's testimony impermissibly included a testimonial statement of a non-testifying witness, we must necessarily be apprised as to how Perlin came to attribute a particular DNA profile to a particular source. The defendant argues that because "Perlin was not involved in the samples' testing . . . he only 'knew' that a DNA profile belonged to 'the gun' and another to '[the defendant]' because [the NMS Labs analyst's] report asserted that to be true." (Emphasis added.) However, as the State correctly points out, the document setting forth the attributions — in whatever form — was not submitted into evidence at trial, and is not part of the record on appeal. This evidentiary shortcoming is fatal to the defendant's second Confrontation Clause argument.

Although the parties are in agreement that Perlin received data from NMS Labs — and that, in some indeterminate fashion, the DNA profiles were attributed to particular sources — without the documents in the record, we are left to speculate as to whether the attributions at issue were on the machine-generated raw data itself — perhaps in the form of a label — or whether they were contained in a formal forensic report, certification, or affidavit. Thus, we are presented with a situation similar to that which we encountered in Dilboy: we have no specific attribution documents to review. See Dilboy, 163 N.H. at 766 ("[A]lthough we review whether a statement is testimonial de novo, in this case we have no specific statements to review because the documents, or other evidence, that constitute the 'test results' were never submitted into the record.").

The precise form that these DNA attributions took, however, is of considerable importance in determining whether they are testimonial. See Crawford, 541 U.S. at 51 (explaining that testimonial statements are "typically . . . solemn declaration[s] or affirmation[s]" (emphasis added; quotation omitted)); Bullcoming, 564 U.S. at 664-65 (noting that, while lack of solemnity "is not dispositive in determining if a statement is testimonial," it was nonetheless "[n]oteworthy" that the report was "formalized in a signed document," and contained a certification and "a legend referring to . . . courts' rules that provide for the admission of certified blood-alcohol analyses" (quotations and brackets omitted)). If, for example, the attributions were

10

simply labels affixed to the machine-generated raw data for internal identification purposes, then it would be less likely that the attributions would be considered testimonial than if they were contained in a sworn report. See, e.g., People v. Lopez, 286 P.3d 469, 478-79 (Cal. 2012) (concluding that labeling a blood sample as belonging to defendant "d[id] not meet the . . . requirement that to be testimonial the out-of-court statement must have been made with formality or solemnity" because the label was "nothing more than an informal record of data for internal purposes"). Because the defendant, as the appealing party, has the burden to provide this court with a record sufficient to address the issues he raised on appeal, State v. Parra, 135 N.H. 306, 309 (1992), and the precise form of the attributions could well be outcome determinative, as in Dilboy, we decline to address an important constitutional issue of first impression based upon an insufficient record. See Dilboy, 163 N.H. at 767.

## III. Statements Against Penal Interest

The defendant next argues that the trial court erred when, relying upon the statement against penal interest exception to the hearsay rule, it admitted out-of-court statements that Papillon made to his sister during two telephone calls from prison. The statements, made by Papillon in Haitian Creole, were admitted through the testimony of the law enforcement officer who translated them into English. The officer testified that, on November 19, 2015, Papillon spoke with his sister over the telephone from prison, and made statements to the effect that: Mizz (a.k.a. Younge) did not shoot M.P., and that Mizz was "hot," which was a term that Papillon used "[a]nytime he was talking in reference of something that was unlawful and [he] did not want to discuss it further over the phone." The officer testified that Papillon also expressed concern about talking on the phone and said that he "told the[] guys to hide their faces and not show themselves anywhere."

The officer also testified that, on January 8, 2016, Papillon again spoke with his sister over the telephone. During the call, Papillon said that he knew that two men had already been arrested and one of them was talking about him. His sister then asked what the person who was talking could say, and Papillon answered, "That I sent the guys to go kill [M.P.]."

New Hampshire Rule of Evidence 804(b)(3) provides that, under certain circumstances, if the declarant is unavailable as a witness, statements against the declarant's interest — such as those tending to subject the declarant to criminal liability — are generally not excluded by the hearsay rule. See N.H. R. Ev. 804(b)(3) (2016) (amended 2017). "The justification for this exception to the hearsay rule rests upon the assumption that one does not make statements that would damage oneself unless the statement is true." State v. Kiewert, 135 N.H. 338, 343 (1992) (quotations and brackets omitted).

On appeal, the defendant argues the trial court erred in ruling that the statements at issue were against Papillon's penal interest. He also argues that even if Papillon's statements were against his penal interest, some of the statements should have been excluded because the State did not establish that the hearsay contained within those statements was admissible. The defendant contends that we must reverse because the "erroneous admission of these statements prejudiced [him]." The State counters that Papillon's statements were properly admitted as statements against interest, but, even if the statements should not have been admitted, their admission at trial constitutes harmless error. Because we agree with the State that any error was harmless, we need not decide whether the admission of these statements was error.

"To establish that an error was harmless, the State must prove beyond a reasonable doubt that the error did not affect the verdict." State v. Edic, 169 N.H. 580, 588 (2017) (quotation omitted). "This standard applies to both the erroneous admission and exclusion of evidence." Id. (quotation omitted).

> The harmless-error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error.

Id. (quotation omitted). An error may be harmless beyond a reasonable doubt if the other evidence of the defendant's guilt is of an overwhelming nature, quantity, or weight, and if the evidence that was improperly admitted or excluded is merely cumulative or inconsequential in relation to the strength of the State's evidence of guilt. Id. at 588-89. In making this determination, we consider the other evidence presented at trial as well as the character of the erroneously admitted evidence itself. Id. at 589.

To convict the defendant of first degree murder as charged in the indictment, the State was required to prove beyond a reasonable doubt that he purposely caused the victim's death. RSA 630:1-a, I(a). To convict the defendant of conspiracy to commit murder as charged in the indictment, the State was required to prove that, with a purpose that murder be committed, the defendant "agree[d] with one or more persons to commit or cause the commission of such crime, and an overt act [was] committed by one of the conspirators in furtherance of the conspiracy." RSA 629:3, I.

Here, the other evidence that the defendant shot the victim — and conspired with Papillon, Smith, and Younge to do so — was overwhelming. Witness testimony and a surveillance video established that the defendant was at the scene of the crime at the time of the murder. A co-conspirator testified that the defendant planned to kill, and then shot, M.P. The defendant's jail

12

cellmate testified that the defendant told him that he killed M.P. because the defendant, along with Papillon, Smith, and Younge, believed M.P. was a police informant. Furthermore, although the defendant initially told the police that he did not know about the murder and was not present at the scene, in recorded phone calls from prison, he later stated that he was at the scene of the crime at the time of the shooting, and thought he would be "good with the case" as long as the others were "quiet." These inconsistent accounts show a consciousness of guilt. See State v. Bean, 153 N.H. 380, 387 (2006) (noting jury could have found defendant's "inconsistent and evasive answers" to police to be "further evidence of [his] consciousness of guilt"). Finally, Perlin stated his expert opinion that the defendant's DNA matched the DNA recovered from the murder weapon.

Therefore, compared to the State's other, overwhelming evidence of the defendant's guilt, Papillon's statements were both cumulative and inconsequential. See Edic, 169 N.H. at 588-89. Accordingly, we conclude that the State has met its burden of proving that any error in admitting Papillon's statements did not affect the verdict and, therefore, was harmless beyond a reasonable doubt. See id.

## IV. Closing Argument

Finally, we address the defendant's argument that it was plain error for the trial court to have failed to act sua sponte to cure the prosecutor's allegedly improper statements made during closing argument. At the outset, we note that the individual prosecuting attorney at trial is not representing the State on appeal. The statements at issue fall into two categories: one set of statements, the defendant contends, constituted an impermissible personal attack on defense counsel, see State v. Dowdle, 148 N.H. 345, 348 (2002), and the other set, he argues, were improper because they impermissibly conveyed to the jury the prosecutor's personal opinions about the defendant's credibility and guilt. See State v. Bujnowski, 130 N.H. 1, 4-5 (1987). Although defense counsel did not object to the statements when they were made, the defendant, nonetheless, asserts that the trial court erred by not sua sponte intervening, and argues that we must reverse his convictions. We are not persuaded.

"In determining whether the prosecutor's comments were improper, we face the delicate task of balancing a prosecutor's broad license to fashion argument with the need to ensure that a defendant's rights are not compromised." State v. Hearns, 151 N.H. 226, 233 (2004). "[W]e consider the challenged remarks in the context of the case." State v. Addison (Capital Murder), 165 N.H. 381, 548 (2013); see also United States v. Robinson, 485 U.S. 25, 33 (1988) (stating "prosecutorial comment must be examined in context"). "A prosecutor may draw reasonable inferences from the evidence presented and has great latitude in closing argument to both summarize and discuss the evidence and to urge the jury to draw inferences of guilt from the

13

evidence." State v. Drown, 170 N.H. 788, 793 (2018). "[P]rosecutors need not pull their punches; they may—indeed, they should—present their cases to criminal juries zealously. Forcefulness in the pursuit of justice is to be admired rather than condemned." United States v. Taylor, 54 F.3d 967, 976-77 (1st Cir. 1995). Nonetheless, a prosecutor may not "stray into forbidden terrain," and the "defendant has a corresponding obligation to protect his own interests." Id. at 976-77 (quotation omitted). "When a defendant defaults on this obligation by failing to make a contemporaneous objection to questionable comments in the prosecution's closing argument," the trial court has no opportunity to respond to the objectionable statement at the time it occurs. Id. at 977.

"Afterthought claims of improprieties allegedly occurring during the summation" are reviewed under our plain error rule. Id.; see also Drown, 170 N.H. at 792. "The plain error rule allows us to exercise our discretion to correct errors not raised before the trial court," however, its application is "limited to those circumstances in which a miscarriage of justice would otherwise result." Drown, 170 N.H. at 792; see also Sup. Ct. R. 16-A. "For us to find plain error: (1) there must be an error; (2) the error must be plain; (3) the error must affect substantial rights; and (4) the error must seriously affect the fairness, integrity or public reputation of judicial proceedings." Drown, 170 N.H. at 792. "[T]he existence of plain error does not depend solely on whether — as an abstract matter — the lawyer's [argument] would have been inadmissible if . . . objected to. Rather, any 'plain error' must relate to the trial court having not taken affirmative steps to intervene in the parties' litigation." Id. at 799 (quotation omitted); see also United States v. Young, 470 U.S. 1, 14 (1985) (concluding that prosecutor's statements, although improper, did not rise to the level of "plain error" warranting the court to overlook the absence of any objection by the defense); State v. Rawnsley, 167 N.H. 8, 12 (2014). "When a defendant fails to object to the prosecutor's closing argument, relief is available to rectify only plain error that is so obvious that failure to correct it would jeopardize the fairness and integrity of the trial." United States v. Bailey, 123 F.3d 1381, 1400 (11th Cir. 1997). "A decision not to object may be a trial strategy that should not be intruded upon by the trial court in the absence of patently egregious circumstances." State v. Labrie, 171 N.H. 475, 489 (2018).

Here, defense counsel did not object during the prosecutor's closing argument, and the trial court took no action. "It is this inaction . . . that provides the basis for our review." Drown, 170 N.H. at 799. Accordingly, the pertinent inquiry with regard to whether a "plain error" occurred in this case is not whether the prosecutor's closing statement was improper, but rather, assuming it was improper, whether the trial court should have acted sua sponte to cure the impropriety. See id.

We now turn to the first set of allegedly improper statements. During his closing argument, the prosecutor stated to the jury that "just like the

14

Defendant, the defense team wants to distract you from the truth." The prosecutor also made other similar statements during his closing. The defendant asserts that, because we held in Dowdle that it was improper for the prosecutor to argue that defense counsel's "job is to obscure the truth if it hurts their client, to distract you from the truth," Dowdle, 148 N.H. at 347-48 (quotation omitted), here it was plain error for the trial court not to intervene during the prosecutor's closing argument. See id. (concluding that such statements were "inexcusable," and "unquestionably inappropriate" (quotation omitted)); State v. Boetti, 142 N.H. 255, 259 (1997) (concluding it was improper for prosecutor to argue during closing that defense strategy did not serve "a truth-seeking function"). The defendant contends that sua sponte court intervention was required because such statements during closing argument "present[] defense counsel with an untenable choice: either, object to the argument that [defense counsel] hides the truth, making it further appear like counsel is doing just that, or forgo an objection to avoid that inference and allow the State to conduct an improper argument." He argues, therefore, that we must reverse because, "[i]n failing sua sponte to strike these improper arguments, the court committed plain error," and that error affected the defendant's substantial rights and "distorted" justice. See Drown, 170 N.H. at 792 (explaining plain error rule). Although we agree with the defendant that the prosecutor made improper statements during his closing argument, we do not agree that the trial court committed plain error by failing to sua sponte intervene and strike the prosecutor's statements.

The prosecutor's statement that "the defense team wants to distract you from the truth," and his other similar statements, were improper. In Boetti and Dowdle we made clear that such "personal attacks directed to the ethics and integrity of opposing counsel are unquestionably inappropriate." Boetti, 142 N.H. at 261; see also Dowdle, 148 N.H. at 347-48. However, neither case holds that it is plain error for the trial court not to sua sponte intervene in response to such statements, because in each case — unlike here — defense counsel contemporaneously objected to the prosecutor's improper statements. See Dowdle, 148 N.H. at 347; Boetti, 142 N.H. at 257-58. Indeed, we have never held that a trial court must interrupt a party's closing argument; rather, "we have often discouraged trial courts from acting sua sponte." Labrie, 171 N.H. at 489; see also Noucas, 165 N.H. at 161; State v. King, 146 N.H. 717, 722 (2001). Defense counsel may have good reasons for not objecting during a prosecutor's closing argument. See Drown, 170 N.H. at 802.

Here, when we consider the prosecutor's improper statements within the context of the case, we conclude that the defendant has failed to show that they were sufficiently egregious so as to require the trial court to intervene. See Labrie, 171 N.H. at 489; State v. Guay, 164 N.H. 696, 704 (2013) (observing that defendant bears burden to show plain error on appeal). We note that the trial court instructed the jury that the lawyers' "[a]rguments are not evidence." See Labrie, 171 N.H. at 489-90. "The jury is presumed to follow

15

the instructions given by the trial court." State v. Littlefield, 152 N.H. 331, 348 (2005). Accordingly, we conclude that it was not error for the trial court not to act sua sponte to cure the prosecutor's improper statements during closing argument.

We now turn to the second set of allegedly improper statements. During closing argument, the prosecutor said "unlike all of you, the Defendant is not concerned with the truth," and "ironically, you all are going to be tasked with doing the very thing that the Defendant said he would never do . . . to speak the truth about his crimes." The prosecutor concluded, "We know that's the truth," and asked the jury to "[t]ell the Defendant the truth about his crimes."

The defendant argues that these statements impermissibly conveyed to the jury the prosecutor's personal opinions about the defendant's credibility and guilt. See Bujnowski, 130 N.H. at 4-5. The State counters that "the prosecutor's statements about the defendant's tenuous relationship with the truth were tethered to the facts: the evidence established that the defendant had not only repeatedly lied to the police during his interrogation, but told them he would never be truthful with them." Further, the State argues, even if improper, the defendant cannot show that the trial court committed plain error.

It is well-established "that it is improper for prosecutors to profess to the jury their personal opinions as to the credibility of a witness or the guilt of the accused." Id. at 4. Here, it is a close call as to whether the statements made by the prosecutor impermissibly expressed a personal opinion about the defendant's credibility or guilt. See id. at 3-5 (finding that prosecutor's statements were improper when he repeatedly, and against the court's admonition, made statements such as "I think the defendant is guilty," and "I think for ninety-nine percent of it [the witness] was lying" (brackets and quotations omitted)). However, we need not decide whether the statements were improper, because, even if they were, the defendant has failed to show that they were sufficiently egregious so as to require the trial court to sua sponte intervene. See Labrie, 171 N.H. at 489-90.

We note that, even if we were to conclude that the trial court's failure to sua sponte intervene was error, the defendant has failed to demonstrate that the error would have adversely affected his substantial rights. Drown, 170 N.H. at 792. "Generally, to satisfy the burden of demonstrating that an error affected substantial rights, the defendant must demonstrate that the error was prejudicial, i.e., that it affected the outcome of the proceeding." State v. Cooper, 168 N.H. 161, 168 (2015) (quotation omitted). Here, given the overwhelming evidence of the defendant's guilt, the defendant cannot demonstrate that any error by the trial court would have affected the outcome of the trial, and, therefore, his substantial rights. See id. at 168-69.

16

Finally, we reiterate that "[w]e strongly caution prosecutors to avoid misstatements of evidence, improper argument, or other improper conduct." Id. at 171 (quotation omitted). Although the defendant has failed to demonstrate that any error by the trial court affected his substantial rights, we do not condone the prosecutor's conduct. See id.

Affirmed.

HICKS, HANTZ MARCONI, and DONOVAN, JJ., concurred.