NOTICE:  This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports.  Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press.  Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us.  Opinions are available on the Internet by 9:00 a.m. on the morning of their release.  The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

———————————————

Hillsborough-northern judicial district
No. 2019-0067

101 OCEAN BLVD., LLC

v.

FOY INSURANCE GROUP, INC. & a. [1]

Argued: January 9, 2020
Opinion Issued: March 19, 2021

Cronin, Bisson & Zalinsky, P.C., of Manchester (John G. Cronin, John F. Bisson, and Daniel D. Muller, Jr. on the brief, and Mr. Cronin orally), for the plaintiff.

Upton & Hatfield, LLP, of Portsmouth (Russell F. Hilliard on the brief and orally), and of Concord (Nathan C. Midolo on the brief), for defendant Foy Insurance Group, Inc.

HANTZ MARCONI, J.  Defendant Foy Insurance Group, Inc. (Foy) appeals a verdict rendered after a jury trial in Superior Court (Brown, J.) in favor of the plaintiff, 101 Ocean Blvd., LLC (Ocean), finding that Foy was negligent for failing to advise Ocean to purchase sufficient insurance coverage to rebuild a hotel, damaged in a 2015 fire, in compliance with the current building code and awarding damages to Ocean.  We affirm.

---

[1] The other defendant named in the plaintiff's original complaint is not a party to this appeal.

I.  Facts

The jury could have found the following facts.  Ocean is owned by Albert J. Bellemore, Jr., a businessman and real estate developer.  In 2006, Ocean purchased the Ocean Boulevard hotel in Hampton.  The hotel had been constructed in the 1920s, and did not conform to contemporary building codes. The hotel had a convenience store on the ground level that sold "pretty much everything."  The hotel also had a lobby floor, a second floor with an office and "a small two-bedroom apartment," and third and fourth floors with hotel rooms.

Since the early 2000s, Bellemore worked with Foy as his insurance agent for several properties.  Shortly after purchasing the hotel in 2006, Ocean, through Foy, purchased a $1.3 million replacement cost policy for the structure.  By 2015, Bellemore "had 14 or 15 different [insurance] policies in force with Foy."  His annual premiums "were just shy of fifty thousand dollars."

In 2011, Bellemore's primary contact at Foy, Heidi SanSouci, expressed concerns about the limits of Ocean's coverage on the hotel property, and recommended that he increase it to approximately $2 million.  Bellemore declined at that time because of the recession.  SanSouci made the same recommendation in 2012 and 2013.  In 2013, Bellemore took SanSouci's advice and purchased the additional coverage, which she placed with Lloyd's of London.

Bellemore frequently relied upon SanSouci's recommendations because he did not "know anything about insurance," he trusted her judgment and insurance experience, and he appreciated her attention to detail and good service.  For instance, in 2013, SanSouci informed Bellemore that there were "several coverages" that she "fe[lt] should be addressed" as to the insurance for the hotel property.  She noted that Ocean lacked flood insurance coverage and that the annual premium for such coverage was $2,702.  She further observed that the current insurance policies did not cover liquor liability and that, although alcohol was not consumed inside the hotel convenience store, "the exposure for a lawsuit does exist" because it was sold there.  She enclosed a quote for liquor liability coverage.

On occasion, Bellemore asked SanSouci to review policies that he had obtained from other insurance agents.  SanSouci occasionally told Bellemore that he should "stay with a different carrier for coverage," even though doing so meant that she would "lose out on some business."  For instance, in a 2015 e-mail to Bellemore, SanSouci said, "Unfortunately, I have not been able to find better pricing for the builder's risk for above.  Although I hate to have you go someplace else for this coverage, I think you should move forward with the other quote."  In that e-mail, she advised Bellemore "to secure premises liability coverage" for that property "so that [he would be] fully covered."

2

In 2014, Lloyd's of London opted not to renew Ocean's policy. As a result, SanSouci asked Andrea Roux, a wholesale broker of "surplus lines" insurance, to find coverage. The "surplus lines" market is not as highly regulated as the standard insurance market, and, therefore, insurance underwriters have the flexibility to design and sell higher-risk policies than they would be able to sell in the standard market. Through the "surplus lines" market, Roux was able to find coverage for Ocean with AIX Specialty Insurance Company, a subsidiary of The Hanover Insurance Company.

In April 2014, Ocean purchased a $2 million replacement cost policy. In addition to the replacement cost coverage, the AIX policy provided for $10,000 in law and ordinance insurance coverage. Law and ordinance coverage is designed to pay for the increased costs associated with complying with current building codes and other laws and ordinances when rebuilding a structure after a loss. At no time did Foy recommend that Bellemore purchase additional law and ordinance coverage on behalf of Ocean.

In October 2015, a fire severely damaged the hotel. Bellemore hired an engineering firm to estimate the cost of rebuilding the hotel. The firm told Bellemore that the cost to replace the existing structure would be approximately $1.1 million, and that, in order to rebuild a structure that complied with the current building code, it would cost an additional $905,070. He decided to demolish the structure rather than rebuild it. After accounting for depreciation, Ocean's insurer paid Ocean $910,141 for the replacement cost of the structure — an amount that did not include the additional cost necessary to rebuild the structure in compliance with the building code.

Thereafter, Ocean sued Foy, alleging that, because the parties had a "special relationship," Foy had a duty to inform Ocean that it lacked sufficient law and ordinance coverage to pay for reconstruction in compliance with the current building code, and that Foy negligently failed to so inform Ocean. See Sintros v. Harmon, 148 N.H. 478, 481-82 (2002) (holding that an insurance agent has "an affirmative duty to provide advice regarding the availability or sufficiency of insurance coverage" only when an insured justifiably relies upon a "special relationship" with the agent). The case was tried to a jury over the course of five days in November 2018. At the close of Ocean's case, Foy moved for a directed verdict, which the trial court denied. The jury returned a verdict in favor of Ocean and then apportioned 25% fault to Ocean and 75% fault to Foy. Foy filed a motion for judgment notwithstanding the verdict (JNOV), or alternatively, to set aside the jury verdict. The trial court denied the motion, and this appeal followed.

On appeal, Foy argues that the trial court erred by: (1) admitting a certain exhibit into evidence; (2) failing to take action in response to Ocean's allegedly improper closing argument; (3) giving the jury certain instructions; (4)

3

giving the jury an incorrect special verdict form; and (5) denying Foy's motions for directed verdict and JNOV. We address each argument in turn.

II. Analysis

    A. Admissibility of Exhibit 27

    On the fourth day of trial, counsel for Ocean cross-examined Foy's expert, Peter Milnes, about "Exhibit 27," which counsel represented was "a commercial lines checklist." Foy's counsel objected that he did not "like the way [the exhibit] was being presented" during cross-examination of Milnes instead of during Ocean's direct examination of its own expert, Franklin Seigel, and on the basis of relevance. The trial court ruled that the exhibit was relevant to the issue of whether Foy breached the applicable standard of care. Foy's counsel also objected on the ground that the checklist constituted inadmissible hearsay. The trial court determined that the exhibit was not being introduced for the truth of what it asserted and, therefore, that its admission did not violate the hearsay rule. See N.H. R. Ev. 801(c) (defining hearsay as a statement "that . . . the declarant does not make while testifying at the current trial or hearing" and that is offered "in evidence to prove the truth of the matter asserted in the statement").

    Milnes testified that the checklist was "a mechanism for discussion" of available coverages "if people want to have that," but he did not agree that the checklist "is a good way to go about examining specific coverages." On redirect examination, Milnes testified that the checklist was not something he used and that it is not "a requirement of the standard of care for insurance agents to maintain such a checklist."

    Defense counsel also questioned Jeffrey Foy, one of Foy's owners, about the checklist, and he testified that he does not use similar forms with his clients because "you always -- you always have to make sure that you let the client know that this [is] just an overview, a belief as to what's included in the policy they have. But ultimately, you have to go back to the policy because that's – that's the contract." Over defense counsel's objection, the exhibit was admitted as a full exhibit.

    On appeal, Foy argues that Exhibit 27 "was irrelevant, improper hearsay, and highly prejudicial." We review the trial court's rulings on admissibility of evidence under the unsustainable exercise of discretion standard. McLaughlin v. Fisher Eng'g, 150 N.H. 195, 197 (2003). We will not disturb the court's ruling unless a party establishes that it is clearly untenable or unreasonable to the prejudice of its case. Id. Here, Foy has failed to persuade us that the trial court unsustainably exercised its discretion by admitting the exhibit. Based upon our review of the record, we find that the trial court had an objective

4

basis to determine that Exhibit 27 was relevant, was not improper hearsay, and was not "highly prejudicial."

### B.  Ocean's Closing Argument

Foy next argues that during Ocean's closing argument, counsel made certain "factually inaccurate and prejudicial statements to the jury," including:

> As a jury, your voice, through your verdict, is very loud and will be certainly heard.  As a jury, you have awesome power to change behavior.  You, as a jury, . . . can change the way insurance policies are sold.

> . . . .

> If sold as replacement cost policies -- and I submit to you that's a misnomer -- who knew that you could buy a two million dollar policy, and because of some coinsurance penalty, you could have a two million dollar loss and never collect the amount of money that you paid for.  Who knew?  And you sell a replacement cost policy that has a limitation of only 10,000 on a two million dollar policy, and you can't replace it for law and ordinance, something that's required.  Use your voice and tell the insurance industry not to sell these policies under the name of replacement costs if they have co-insurance in them.  Tell them not to sell them as replacement costs if they don't provide adequate coverage for law and ordinance.

> The defense takes the position, so what, we couldn't get [additional law and ordinance insurance coverage] anyway.  There is no proof of that.  Who said [we] couldn't get it.  We heard it from Team Insurance, Ms. SanSouci and Mr. Foy and Mr. Milnes, all together in the insurance industry.  They all did the same thing; they speculated.

Foy contends that Ocean's closing argument was "highly prejudicial" because Ocean improperly appealed "to the passion, prejudice, and sympathy of the jury."  Foy asserts that the "misstatements" during Ocean's closing warrant a new trial.  See Stachulski v. Apple New England, LLC, 171 N.H. 158, 171 (2018) (noting that "arguments that appeal to the emotions or prejudices of jurors may be improper when [they] take the form of counsel's presentation of facts which have not been introduced in, or are not fairly inferable from, evidence at trial" (quotation omitted)).

It is well established that a party must make a specific and contemporaneous objection during trial to preserve an issue for appellate

review. Broughton v. Proulx, 152 N.H. 549, 552 (2005). This requirement affords the trial court an opportunity to correct any error it may have made and is grounded in common sense and judicial economy. Id. With respect to a closing argument in a civil jury trial, any objection must be raised either during or immediately after the closing argument. Broderick v. Watts, 136 N.H. 153, 167 (1992).

At trial, Foy failed to object to any of the statements it now characterizes as "highly prejudicial." To the extent that Foy objected to closing argument in its post-trial motion for JNOV, its objections were untimely. See Broderick, 136 N.H. at 167-68 (holding that objection to closing argument raised after the trial court finished instructing the jury was not timely raised).

Because Foy failed to object during or immediately after Ocean's closing argument, our review is for plain error. See Sup. Ct. R. 16-A; see also State v. Drown, 170 N.H. 788, 792 (2018). We use the plain error rule sparingly, limiting its application to those circumstances in which a miscarriage of justice would otherwise result. Drown, 170 N.H. at 792. For us to find plain error: (1) there must be an error; (2) the error must be plain; (3) the error must affect substantial rights; and (4) the error must seriously affect the fairness, integrity, or public reputation of judicial proceedings. Id.

The alleged error in this case "must relate to the trial court having not taken affirmative steps to intervene in the parties' litigation." Id. at 799 (quotation omitted). In other words, the issue is not whether the trial court erroneously allowed Ocean's counsel to make the challenged statements, but rather, due to Foy's failure to object, whether the trial court erroneously failed to "have sua sponte intervened" to strike the statements, give a curative instruction, or declare a mistrial. Id.

"[I]n Drown, we held, under plain error review, that the trial court did not err in failing to sua sponte interrupt the State's closing argument." State v. Labrie, 171 N.H. 475, 489 (2018); see Drown, 170 N.H. at 801. In doing so, we recognized that "[a] decision not to object" during an opposing party's closing argument "may be a trial strategy that should not be intruded upon by the trial court in the absence of patently egregious circumstances." Labrie, 171 N.H. at 489. We stated that the decision not to object at closing argument may have stemmed from a conclusion that the prosecutor's statements were "nonsensical and would be seen as such by the jury, and thus undermine the force of the message that the prosecutor was attempting to convey." Drown, 170 N.H. at 802.

Although the alleged misstatements at issue here are not nonsensical, "they also were not so egregious as to impose upon the trial court an obligation to intervene" sua sponte. Labrie, 171 N.H. at 489. The statements Foy contests on appeal would have been cured by the trial court's jury instructions

6

that: (1) the jury "must not decide the facts on the basis of anything said by counsel not supported by the evidence"; (2) the jury's responsibility is to decide the facts without "sympathy, prejudice, bias, or favor or fear, for or against either party"; (3) the amount of damages the jury may award "must be full, fair, and adequate," and "not be . . . a reward or a prize"; (4) "[i]n order to recover, the Plaintiff must prove the Defendant is legally at fault for damages"; (5) "[f]or each item of loss of damage the Plaintiff claims, Plaintiff must prove that it is more probable than not, one, the Plaintiff has (or will have) such a loss or damage, and two, the loss or damage was caused by the legal fault of defendant"; and (6) "[t]he purpose of . . . civil law is not to punish anyone but to compensate those who have been monetarily injured as a result of the legal fault of the Defendant in such amounts as the evidence justifies." See id. at 489-90; see also Murray v. Developmental Servs. of Sullivan County, 149 N.H. 264, 270 (2003) (holding that, although it was improper for the plaintiffs to ask the jury to "send a clear message" with its verdicts in closing argument, the trial court sustainably exercised its discretion by not giving an immediate curative instruction and instead later instructing the jury that it should not award a verdict to punish the defendant and that the plaintiffs had to prove the defendant caused their injuries); Kelleher v. Marvin Lumber & Cedar Co., 152 N.H. 813, 837 (2005) ("[T]he jury is presumed to follow the court's instructions."). Although we do not condone the challenged portions of Ocean's closing argument, under the circumstances of this case, we cannot conclude that the trial court's failure to interrupt Ocean's closing and/or immediately provide additional instructions amounted to a plain error that affected Foy's substantial rights. See Stachulski, 171 N.H. at 172 (concluding that the trial court's "failure to sua sponte strike" certain statements from the opening statement and closing argument of the plaintiff's counsel "was not error, let alone plain error").

C. Jury Instructions

Foy challenges the trial court's jury instructions on: (1) when a "special relationship" between an insurance agent and client exists; (2) the need for alterations or repairs to a damaged building to conform to state, local, and federal laws; and (3) damages. The purpose of jury instructions is to identify issues of material fact, and to explain to the jury, in clear and intelligible language, the proper standards of law by which it is to resolve them. Halifax-American Energy Co. v. Provider Power, LLC, 170 N.H. 569, 577 (2018). The scope and wording of jury instructions are within the sound discretion of the trial judge and are evaluated as a reasonable juror would have interpreted them. Id. at 577. A trial court need not use the exact words of any party's jury instruction request. Id. A jury charge is sufficient as a matter of law if it fairly presents the case to the jury such that no injustice is done to the legal rights of the parties. Id. In a civil case, we review jury instructions in context. Id. at 578. We will reverse if the charge, taken in its entirety, fails to explain

7

adequately the law applicable to the case in such a way that the jury could have been misled. Id.

### 1. Special Relationship

The trial court instructed the jury as follows on when a "special relationship" between an insurance agent and client arises:

> The general duty of care does not include an affirmative obligation to give advice regardless of the availability or sufficiency of coverage.
>
> However, the existence of a "special relationship" between the insurance agent and the client may impose upon an insurance agent an affirmative duty to provide advice regardless of the availability or sufficiency of insurance coverage. An insured . . . can demonstrate . . . a "special relationship" by showing that there exists something more than the standard insurer-insured relationship between the parties. This depends upon the particular relationship between the parties and is determined on a case-by-case basis. Examples include an express agreement between the insured agent and client, a long-established relationship or entrustment in which the agent clearly appreciates the duty of giving advice, the paying [of] an additional compensation apart from the premium payment, and the agent holding himself or herself out as a highly-skilled expert coupled with reliance by the insured. Also, a "special relationship" between the parties may exist when the insured relies upon the agent's offered expert [advice] regarding the question of coverage, or when there is a course of dealings over time putting the agent on notice that his or her advice is being sought and relied upon. If a "special relationship" exists between the parties, the Plaintiff must demonstrate not only the existence of the relationship, but also that he or she was justified in relying upon the relationship.

Foy argues that this jury instruction "incorrectly suggested that a special relationship could be established without proof of at least one of the Sintros factors, and, therefore, misstated the law to the jury." See Sintros, 148 N.H. at 481-82. To the contrary, the instruction repeats, nearly verbatim, what we said in Sintros. See id. The examples we gave in Sintros of facts or circumstances demonstrating a special relationship between an insurance agent and a client were just that, examples; they were not an exclusive list of factors. Id. at 482. Nor did we hold that, to establish the existence of a special relationship, a plaintiff had to prove that its relationship with its insurance agent fit one of our examples. See id. at 481-82. Therefore, we conclude that

8

the trial court's "special relationship" instruction was sufficient as a matter of law. See Halifax-American, 170 N.H. at 578.

## 2. Law and Ordinance

With respect to law and ordinance coverage, the trial court instructed the jury that: (1) "[r]epairs to a substantially damaged building must meet and conform to existing State Codes and local and federal laws"; (2) "[a]ll work should be in compliance with all applicable State and local building[] [codes] and the Life Safety code"; and (3) "[a]lterations including reconstruction and during the reconstruction, if existing elements, spaces, or common areas are altered, that each such altered element, space, or area should comply with the Americans with Disabilities Act."

Foy argues this instruction misstated the applicable law "because the applicable codes allow municipal officials discretion to modify strict provisions of the code, and a local official's discretionary authority was not properly reflected in the instruction." We disagree.

To support its contention, Foy asserts that the "Town of Hampton has incorporated the State Building Code" and that the State Building Code "expressly incorporates" an international building code, which authorizes local officials "to grant modifications for individual cases." However, the State Building Code adopts certain international building codes by reference, only "as amended by the state building code review board and ratified by the legislature." RSA 155-A:1, IV (Supp. 2020). Foy does not cite any provision of the State Building Code that specifically adopts the modification provision upon which Foy relies. Indeed, RSA 155-A:2, I, expressly requires that "[a]ll buildings, building components, and structures constructed in New Hampshire shall comply with the state building code and state fire code." RSA 155-A:2, I (2014) (emphasis added). In addition, RSA 155-A:2, X specifically precludes any "state agency, authority, board, or commission" from "vary[ing], modify[ing], or waiv[ing] the requirements of the state building code or state fire code, unless approved by the state building code review board . . . or the state fire marshal." RSA 155-A:2, X (2014).

Moreover, although the international building code upon which Foy relies empowers "the code official" to grant modifications, the code official may do so only after "first find[ing] that [a] special individual reason makes the strict letter of [the international] code impractical and the modification is in compliance with the intent and purposes of the code, and that such modification does not lessen health, accessibility, life and fire safety, or structural requirements." The international code also provides that, although "[t]he code official" may "adopt policies and procedures" to "clarify the application of [the code's] provisions," those "policies and procedures shall not

9

have the effect of waiving requirements specifically provided for" in the code. (Emphasis added.)

For all of these reasons, therefore, we are not persuaded that the trial court's instruction regarding the need for repairs to damaged buildings to comply with the State Building Code misstated the applicable law or misled the jury.

Foy also contends that the instruction was misleading because it told the jury that it had to focus "its analysis on whether . . . Ocean's repair did or did not have to comply with [the code] provisions." We do not agree that the instruction was misleading in this respect. Further, we observe that the instruction is consistent with the testimony of the town building inspector that "[w]hen there's substantial damage to a building" requiring that the building "be put back together," the owner is required to "bring [the building] to code."

### 3. Damages

During the trial, Foy proposed that the trial court instruct the jury that it could consider as damages in this case "[t]he reasonable value of the actual costs incurred by [Ocean] to comply with the minimum standards of an ordinance or law in [the] course of a repair to the property." Foy explained that its proposed instruction used an example "for auto cases." Foy argued that the trial court's proposed instruction was faulty because it did not identify "what the items or loss of damages [the jury is] to consider in reviewing damages."

The trial court declined to give Foy's proposed instruction and instead instructed the jury:

> And now a person who claims damages has the burden of proving that it is more probable than not that the damage[s] that it seeks were caused as a result of the legal fault of the party, and must show the extent and the amount of those damages.

> For each item of loss of damage the Plaintiff claims, Plaintiff must prove that it is more probable than not, one, the Plaintiff has (or will have) such a loss or damage, and two, the loss or damage was caused by the legal fault of defendant. If you decide that a plaintiff has proven these two matters to be more probable than not, you must then decide how much money or damages will fully, fairly and adequately compensate the Plaintiff for each of those items for loss or damage.

> In the event you should find for the Plaintiff, you must award a -- you must award it a fair compensation for the damages sustained.

10

If you find the Plaintiff is entitled to recover damages, the amount thereof must be full, fair, and adequate. It must not be cheap or miserly, and should be -- nor should it be a reward or a prize. The Plaintiff is entitled to full compensation for the damages resulting from Defendant's legal fault. The purpose of a civil law is not to punish anyone but to compensate those who have been monetarily injured as a result of the legal fault of the Defendant in such amounts as the evidence justifies.

In determining the amount of damages to allow the Plaintiff, you may draw such inferences as are justified by your common experience and observations of mankind, from the evidence and the nature of the injuries and the results thereof.

See Carlisle v. Frisbie Mem. Hosp., 152 N.H. 762, 778 (2005) (observing that the trial court gave the jury "a broad instruction on damages," stating "that the damage award should be 'full, fair and adequate' and that the award should compensate the plaintiff and make her whole").

Foy argues that the court erred by not giving its instruction "[b]ased on the nature of . . . Ocean's claim," which Foy characterizes as a claim under Ocean's insurance policy, rather than the negligence claim Ocean brought. Foy contends that "the proper measure of damages" in this case "is the cost incurred as a result of a lack of coverage," and that its "instruction properly captured the measure of damages based on Ocean's policy, and should have been given."

However, Foy has not preserved this appellate argument for our review. Generally, a contemporaneous objection is necessary to preserve a jury instruction issue for appellate review. Clark & Lavey Benefits Solutions v. Educ. Dev. Ctr., 157 N.H. 220, 223 (2008). Without a contemporaneous objection, the trial court is not afforded the opportunity to correct an error it may have made. Id. "This long-standing requirement is grounded in common sense and judicial economy, and applies equally to civil and criminal matters." Id. (quotation omitted).

Foy did not argue in the trial court that the court's instruction gave the wrong measure of damages. Thus, we express no opinion as to the proper measure of damages for an insurance agent's negligence in a case such as this one. See 2 Law and Practice of Insurance Coverage Litigation § 27:14, at 27-43 (David L. Leitner et al., eds., 2005) (observing that, when an insurance agent fails to procure certain insurance coverage, "[m]any courts limit recovery to the amount that would have been available under the properly procured policy minus any unpaid premium," and that other courts "permit an insured to recover all consequential damages, including lost profits, attorney's fees and

11

costs," reasoning "that an insured is entitled to all damages proximately caused by the broker/agent[']s conduct" (footnotes omitted)).

D.  Special Verdict Form

The special verdict form asked, among other questions, whether the jury found that Foy's "breach of the applicable standard of reasonable care was a substantial factor in bringing about [Ocean's] alleged damages." Foy argues that the special verdict form was incorrect because it did not also ask the jury whether Ocean's damages would not have occurred without Foy's conduct.

"A special verdict form must enable the court to determine which party is entitled to judgment." Madeja v. MPB Corp., 149 N.H. 371, 389 (2003). "[I]t cannot be so confusing as to mislead the jury." Id. "We examine the wording of the special verdict form, the court's jury instructions, and the evidence at trial to determine whether the special verdict form fairly presented the issues to the jury." Id.

Under New Hampshire law, "[c]ausation focuses on the mechanical sequence of events." Carignan v. N.H. Int'l Speedway, 151 N.H. 409, 414 (2004) (quotation omitted). "Proximate cause involves both cause-in-fact and legal cause." Id. (citation omitted). "Cause-in-fact," also called "but for" causation, requires the plaintiff to "produce evidence sufficient to warrant a reasonable juror's conclusion that the causal link between the negligence and the injury probably existed." Id. (quotation omitted). "[L]egal cause requires the plaintiff to establish that the negligent conduct was a substantial factor in bringing about the harm." Id. "The negligent conduct need not be the sole cause of the injury; however, to establish proximate cause, the plaintiff must prove that the defendant's conduct caused or contributed to cause the harm." Id.

As Foy concedes, the trial court's jury instructions properly instructed the jury as to Ocean's burden to prove causation. "We hold that the instructions and the special verdict form, when viewed together, were sufficiently clear" with respect to Ocean's burden to prove causation. Madeja, 149 N.H. at 390. In Madeja, the defendant argued that the special verdict form was faulty because it did not include questions about the defendant's affirmative defenses. Id. at 389. We held that the instructions and special verdict form, when viewed together, were sufficiently clear as to those defenses because the questions on the special verdict form regarding whether the defendant was liable for either sexual harassment or retaliation "subsumed and incorporated questions regarding the defendant's affirmative defenses." Id. at 389-90. We explained that having been instructed correctly about the defendant's affirmative defenses, the "jury could not have found the defendant

liable for either sexual harassment or retaliation if it had concluded that the defendant succeeded on its affirmative defenses." Id. at 390.

Similarly, here, having been correctly instructed as to Ocean's burden on causation, the jury could not have found Foy's conduct to be a "substantial factor" in bringing about Ocean's damages if it had not also found that a "causal link between the negligence and the injury probably existed." Carignan, 151 N.H. at 414 (quotation omitted). The question about whether Foy's conduct was a "substantial factor" in bringing about Ocean's damages "subsumed and incorporated" the question of whether there was a causal link between Foy's negligence and Ocean's damages. Madeja, 149 N.H. at 390; see Carignan, 151 N.H. at 414.

E. Motions for Directed Verdict and JNOV

Finally, Foy asserts that the trial court improperly denied its motions for directed verdict and JNOV. "[M]otions for directed verdict and judgment notwithstanding the verdict are essentially the same, and they are governed by identical standards." Hall v. Dartmouth Hitchcock Med. Ctr., 153 N.H. 388, 393 (2006). Because motions for JNOV and directed verdict relate to the sufficiency of the evidence, they present questions of law, and our standard of review is de novo. See Halifax-American, 170 N.H. at 576. A party is entitled to a directed verdict or JNOV only when the sole reasonable inference that may be drawn from the evidence, which must be viewed in the light most favorable to the non-moving party, is so overwhelmingly in favor of the moving party that no contrary verdict could stand. See id. (discussing a motion for JNOV); Conrad v. N.H. Dep't of Safety, 167 N.H. 59, 70 (2014) (discussing a motion for directed verdict). "The court cannot weigh the evidence or inquire into the credibility of the witnesses, and if the evidence adduced at trial is conflicting, or if several reasonable inferences may be drawn, the motion should be denied." Halifax-American, 170 N.H. at 576; see also Conrad, 167 N.H. at 70.

1. Special Relationship

Foy contends that no rational trier of fact could have found that Foy and Ocean had a "special relationship" because there was no evidence "as to the nature of a standard relationship" between an insurance agent and a client, or of any of the so-called Sintros factors. Foy's arguments are based upon a misreading of Sintros.

Although in Sintros we stated that "[a]n insured can demonstrate a special relationship by showing that there exists something more than the standard insurer-insured relationship," Sintros, 148 N.H. at 481, we then explained what we meant by "something more than the standard insurer-insured relationship" by giving examples of when a "special" relationship may be deemed to arise. See id. at 481-82. Under Sintros, a standard relationship

13

between an insured and an insurance agent is simply one that is not "special." See id.

Moreover, as previously discussed, in Sintros, we did not give an exhaustive list of factors that establish that a relationship between an insurance agent and an insured is "special." See id. at 481-82. Rather, we held that whether the relationship between an insurance agent and an insured is sufficiently "special" as to impose upon the agent an affirmative duty to advise the insured "regarding the availability or sufficiency of insurance coverage," is a fact-dependent inquiry that "is determined on a case-by-case basis." Id. at 481. As we previously explained, the examples we gave in Sintros of when a relationship between an insurance agent and an insured may be deemed "special" were examples, not a mandated or an exhaustive list of factors. Id. at 482.

Further, even if the jury had been instructed as to the so-called Sintros factors, as articulated by Foy, when we view the evidence and all reasonable inferences in the light most favorable to Ocean, we conclude that the evidence was sufficient for the jury to have found at least one of those factors. According to Foy, the so-called Sintros factors include "a long established relationship of entrustment in which the agent clearly appreciates the duty of giving advice." Viewing the evidence in the light most favorable to Ocean, the jury could have found that Ocean and Foy had a relationship, spanning more than a decade, in which Foy's agent, SanSouci, gave insurance coverage advice to Ocean's principal, Bellemore, upon which Bellemore reasonably relied because of SanSouci's greater expertise, and in which SanSouci appreciated her duty to give such advice.

### 2. Evidence of Causation

Foy next asserts that there was insufficient evidence to establish that Ocean, "in fact, could have purchased additional law and ordinance coverage." Foy contends that, absent such evidence, Ocean would have suffered damages regardless of whether Foy breached its duty, and, therefore, Ocean failed "to prove, through admissible evidence, that its claimed damages were legally and factually caused by Foy's breach." See Carignan, 151 N.H. at 414 (discussing cause-in-fact and legal cause). We disagree.

For the purposes of this discussion, we assume without deciding that, as Foy intimates and as the dissent concludes, Ocean was required to show not only that additional law and ordinance coverage was generally available in the marketplace, but was also specifically available to Ocean. We note that this is an issue of first impression that the parties have not fully briefed. Compare Emer's Camper Corral, LLC v. Alderman, 943 N.W.2d 513, 515 (Wis. 2020) (holding that, to establish causation, a plaintiff, claiming that its insurance agent was negligent in procuring insurance, had to prove "not just that an

14

insurance policy with the requested deductibles was commercially available, but also that an insurer would actually write that policy for [the plaintiff] in particular"), with Bayly, Martin & Fay v. Pete's Satire, 739 P.2d 239, 244 (Colo. 1987) (en banc) (explaining that, to establish proximate causation, the insured "is not required to show that the particular insurance company from which the servicing broker or agent procured the [insured's] policy would have written such coverage or that the servicing broker or agent could have obtained such coverage from a specific company").

Viewing the evidence and all reasonable inferences in the light most favorable to Ocean, we conclude that the evidence was sufficient for a rational trier of fact to have found that additional law and ordinance coverage was generally available in the marketplace and was specifically available to Ocean. See Halifax-American, 170 N.H. at 576; Conrad, 167 N.H. at 70.

Ocean's expert, Seigel, testified as follows:

Q  With respect to law and ordinance coverage, is that something that's generally available in the surplus markets?

A  Yes. You have to add -- you, generally speaking, have to ask for it.  It's not a throw-on by the surplus lines' market, and neither is a throw-on from the admitted market.  You still have to ask for it. And you have to negotiate it with the carrier, or with the surplus lines' managing general agent.

Q  Is it your opinion that if asked for that law and ordinance coverage endorsement would have been available in this case?

A  In my experience, yes. I made . . . a phone call on it to see if a particular carrier would write it.  And they said that based on the $2,000,000 that was already written, they would have reduced that limit to the full replacement -- to the replacement cost and just cut that limit and provided the difference between a million -- roughly 1,100,000 for replacement value and used 900,000 as the law and ordinance limit.

Q  Is it your experience that you can custom-make policies in the surplus lines' market?

A  Oh, yes, very much so.  That's the whole -- one of the advantages of the surplus lines' market being free of rate and form. They can do whatever they want to do.

Q  So, for instance, in this case if you went out and looked for it, you could negotiate with a carrier and perhaps get a policy that

15

has 1.3 million in building coverage and 700,000 in law and ordinance?

A  Yes.

Q  Is it your testimony here today that law and ordinance coverage is free and you don't pay anything extra for it?

A  Well, it's not free in the sense that -- everything comes with a price.  So if you divvy up the limit, in other words if you're going to have a $2,000,000 limit on the policy and then add law and ordinance coverage for another $1,000,000, you're going to pay the premium for a $1,000,000 of that coverage.

    If you were to have split it, 1,300,000 let's say of the $2,000,000, then the policy premium will drop for that 1,300,000, but there'll be a charge for the other $700,000 for the law and ordinance coverage.  That's how it basically works.  And then the underwriter that I spoke to said he probably would charge $500 or so for the endorsement itself, just the fact that he's adding another endorsement to it.

Q  So at the end of the day, you'd still have $2,000,000 in coverage, but it would be spread around differently?

A  Yes.

The jury also had evidence that the direct construction cost to replace the building was $1,100,000, not including profit and overhead costs.  If profit and overhead were included, the direct construction cost to replace the building was $1,300,000.

    Viewing this testimony and the reasonable inferences therefrom in the light most favorable to Ocean, a rational trier of fact could have found that Ocean could have obtained, in the surplus lines market, law and ordinance coverage of between $700,000 and $1,000,000 and could have reduced the replacement coverage for the building accordingly, so that the total coverage would have been $2,000,000.  A rational trier of fact could have found, based upon Seigel's testimony, that there would have been little difference between what Ocean paid in premiums under its then-current coverage and what it would pay in premiums if replacement coverage were reduced to $1,300,000 or $1,100,000 and law and ordinance coverage were increased to $700,000 or $900,000, other than an endorsement processing fee of $500.  A rational trier of fact could also have found that replacement costs of $1,300,000 or $1,100,000 and law and ordinance coverage of $700,000 or $900,000 would

16

have been sufficient to cover the damage Ocean sustained and rebuild the structure to current code.

To the extent that Seigel's testimony was ambiguous, "[w]e must . . . construe the ambiguity in favor of [Ocean]." St-Laurent v. Fiermonti Oldsmobile, 136 N.H. 70, 75 (1992). Because a rational trier of fact could have understood Seigel's testimony to provide the evidentiary link Foy intimates, and the dissent concludes, was missing, we affirm the trial court's denial of Foy's motions for directed verdict and JNOV on this issue.

Affirmed.

DONOVAN, J., concurred; HOURAN, J., retired superior court justice, specially assigned under RSA 490:3, concurred; BASSETT, J., with whom HICKS, J., joined, dissented.

BASSETT, J., with whom HICKS, J., joins, dissenting. I agree with my colleagues in most respects. However, because I conclude that Ocean failed to adduce sufficient evidence to enable a reasonable jury to find that Ocean's loss would not have occurred without Foy's conduct, and because such proof is a necessary element of a negligence action, I would reverse the trial court's denial of Foy's motions for a directed verdict, for judgment notwithstanding the verdict, and to set aside the jury verdict. My disagreement with the majority is essentially two-fold.

First, I disagree with the majority when it merely assumes that "Ocean was required to show not only that additional law and ordinance coverage was generally available in the marketplace, but was also specifically available to Ocean." No assumption is necessary — that is the law in New Hampshire.

"It is axiomatic that in order to prove actionable negligence, a plaintiff must establish that the defendant owed a duty to the plaintiff, breached that duty, and that the breach proximately caused the claimed injury." Carignan v. N.H. Int'l Speedway, 151 N.H. 409, 412 (2004) (quotation omitted). "Causation focuses on the mechanical sequence of events. Proximate cause involves both cause-in-fact and legal cause." Id. at 414 (citation omitted). "Cause-in-fact requires the plaintiff to show that the injury would not have occurred but for the negligent conduct." Id. The plaintiff "must produce evidence sufficient to warrant a reasonable juror's conclusion that the causal link between the negligence and the injury probably existed." Id. (quotation omitted). "[L]egal cause requires the plaintiff to establish that the negligent conduct was a substantial factor in bringing about the harm." Id. "[T]here is no cause of action unless and until there has been an injury." White v. Schnoebelen, 91 N.H. 273, 274 (1941). "[B]asic tort law prohibits recovery where it cannot be shown with reasonable certainty that any damage resulted from the act

17

complained of." Witte v. Desmarais, 136 N.H. 178, 188 (1992) (quotation and brackets omitted).

Our court has not had occasion to explain how these well-accepted principles of proximate cause apply in the context of an insured's negligence claim against an insurance agent. However, as the majority recognizes, we are not the first court to consider the issue. I find the reasoning of the Wisconsin Supreme Court in Emer's Camper Corral, LLC v. Alderman, 943 N.W.2d 513 (Wis. 2020), to be persuasive. It is consonant with the law of causation in New Hampshire, and illustrative of the proper application of the general causation principles in this context.

In Camper Corral, the plaintiff claimed that its insurance agent was negligent because he procured a policy that did not conform to the plaintiff's requested deductible limit. Id. at 515. The trial court entered a directed verdict in favor of the insurance agent, reasoning that the plaintiff's "failure to introduce evidence that an insurer would have insured the company with the deductible limits it thought it had meant that it had not proven a causal link between the agent's negligence and the sustained loss." Id.

The Wisconsin Supreme Court granted review and held that, to establish causation, the plaintiff must prove "not just that an insurance policy with the requested deductibles was commercially available, but also that an insurer would actually write that policy for [the plaintiff] in particular." Id. In reaching its conclusion, the court observed that commercial availability is a "necessary prerequisite" to establishing causation; "[a]fter all, if the insured requests a policy that is not available in the market, the insured's harm comes from its unavailability, not from the broker's failure to obtain what does not exist." Id. at 519. Nonetheless, the court concluded that commercial availability is not "sufficient for that causal link," id., explaining as follows:

> An insurance policy is not a mass-produced good or service that is available to the public without regard for the circumstances of the prospective purchaser. Instead, the coverage, terms, and premium depend on factors specific to the insured company, such as, for example, its claims history. So when we say a policy with certain deductible limits is "commercially available," what we mean is that somewhere in the market there is an insurance company willing to write that policy for a hypothetical company with a hypothetical set of insurability factors.

> But just because an insurance company would write a specific policy for one company does not mean it would insure all companies under the same terms. Consequently, "commercial availability" of the policy requested by [the plaintiff] establishes, at most, that some company somewhere could get the desired

18

deductible limits. It does not answer whether such a policy was available to [the plaintiff]. So, if general commercial unavailability prevents formation of a causal link between a broker's negligence and an insured's loss, then it necessarily follows that the policy's unavailability to [the plaintiff] in particular must also prevent formation of a causal link. Whether the unavailability is general, or instead particular to [the plaintiff], the policy's unavailability exists independently of any negligence on behalf of the broker. And if that is so, then the broker's negligence cannot be a substantial factor in producing [the plaintiff's] loss because it would have occurred even if the broker had not been negligent.

Id. at 519-20 (citations and footnote omitted).

The court further reasoned that, to accept the plaintiff's contention that a showing of general commercial availability constitutes sufficient proof of causation, would be to grant the plaintiff "an evidentiary presumption to help it bridge the gap between general and particular availability of the desired insurance policy." Id. at 521. After recognizing that it might be difficult for a plaintiff to prove that it could have obtained the desired policy, the court stated that "[it does] not think the difficulty of a task is a sufficient basis for relieving a plaintiff of its duty to prove the essential elements of its claim." Id. The court also noted that the alternative approach of placing the burden on the agent to prove unavailability "would require proof of a negative." Id. In other words, the insurance agent "would have to prove that no insurer in the market would insure [the plaintiff] under the requested terms." Id. Accordingly, after observing that the plaintiff "has offered no rationale for either relieving it of its duty to prove each element of its claim, or requiring [the insurance agent] to negate the presumption in favor of causation," the court concluded that "the general principles governing proof of causation do not support [the plaintiff's] 'commercial availability' standard." Id.

In sum, the court held that, in order to establish the causal link between the agent's negligence and the plaintiff's loss, a showing of general availability is not enough — a plaintiff must also show that insurance coverage is available to the plaintiff for the particular risk at issue. See id. at 524-25. I agree, and would explicitly apply the reasoning of the Wisconsin Supreme Court in this case. The majority's failure to do so distances our court from fundamental principles of causation and the burden of proof, such that this decision could arguably "allow [a plaintiff] to establish causation without ever proving an event sufficient to result in its loss." Id. at 522.

The majority is also mistaken when it applies the "specific availability" standard of causation and concludes that the evidence adduced at trial is sufficient to enable a rational trier of fact to find that Foy caused Ocean's injury. Specifically, the majority concludes that the evidence is sufficient to

19

establish not only "that additional law and ordinance coverage was generally available in the marketplace," but that such coverage "was specifically available to Ocean." The latter conclusion is based on the incorrect premise that Seigel's testimony supports the following two inferences: First, that, by reducing the replacement cost coverage proportionally, "Ocean could have obtained, in the surplus lines market, law and ordinance coverage of between $700,000 and $1,000,000"; and, second, that there "would have been little difference between what Ocean paid in premiums under its then-current coverage and what it would pay in premiums if replacement coverage were reduced to $1,300,000 or $1,100,000 and law and ordinance coverage were increased to $700,000 or $900,000, other than an endorsement processing fee of $500." The evidence simply does not permit a reasonable jury to draw these inferences.

Although Seigel testified that it might have been possible for Ocean to secure $700,000 in law and ordinance coverage, he never opined as to the premium for that coverage. No reasonable jury could have understood his testimony to support the proposition that the reduction in replacement cost coverage would reduce the premium by the same amount that the additional law and ordinance coverage would increase the premium. Indeed, Seigel acknowledged that law and ordinance coverage is "not free," that "everything comes with a price," and that "you're going to pay the premium for [the additional law and ordinance] coverage." Had Seigel been able to opine that the premium changes would offset each other — or even offer a rough estimate as to how much the additional coverage would have cost — surely he would have said so directly. Had he done so, we would have a much different case before us. However, in this case, the record reflects that the cost of additional law and ordinance coverage in the surplus lines market is risk-sensitive, and could vary widely. This is especially so with respect to the hotel, which was difficult to insure because of the risks associated with its loss history, age, and proximity to the ocean.

It may be true, as a general proposition, that one can purchase just about anything if price is no object — including insurance for almost any risk. However, that aphorism has little utility here, because there was no evidence that Ocean would have been willing and able to pay the additional premium for any given amount of law and ordinance coverage.[2] Although Bellemore testified that, because of the age of the structure and the fact that it was non-conforming, he "would have had to buy" additional law and ordinance coverage

---

[2] For example, Mark Boland, a division president at The Hanover Insurance Company, testified that "if [someone] wanted to pay $900,000 in premium for a million dollar coverage," he would "[a]bsolutely" want to write that coverage. These numbers graphically illustrate why evidence as to the amount of the premium is necessary for Ocean to prove causation. In the event that Ocean had purchased the additional law and ordinance coverage at this price, it would have paid a total of $1.8 million in premiums during 2014 and 2015 for $1 million in law and ordinance coverage.

if it were available, he made this statement without reference to any information as to the cost or availability of any particular amount of coverage. Indeed, there was evidence that, over the years, Bellemore was a price-sensitive insured, who, on several occasions, after weighing the costs and benefits of additional coverage suggested by Foy, rejected Foy's recommendations to add or increase coverage. Accordingly, the mere assertion by Bellemore that Ocean would have purchased additional law and ordinance coverage if recommended by Foy — regardless of price — is insufficient to bridge the evidentiary gap.

Given the dearth of evidence as to the likely premium for any particular amount of law and ordinance coverage, or whether, at any price point and level of coverage, Ocean would have purchased the additional coverage, I conclude that the existence of Ocean's claimed damages is too speculative to support recovery. See Desmarais, 136 N.H. at 188; Schnoebelen, 91 N.H. at 274. This conclusion is inescapable, and necessarily follows from the application of long-established principles of causation. In order to satisfy its burden, Ocean must show both that Foy's negligent conduct was a substantial factor in causing the uninsured loss, and that the loss would not have occurred without Foy's negligent conduct. Carignan, 151 N.H. at 414. Here, if additional law and ordinance coverage for the hotel had not been available in the surplus lines market, or if Ocean would not have purchased the coverage even if it had been available, then Ocean's injury — the uninsured loss — would have occurred regardless of Foy's conduct. Accordingly, because it cannot be said "with reasonable certainty" that Ocean's injury "resulted from" Foy's conduct, Desmarais, 136 N.H. at 188 (quotations omitted), I would reverse the trial court's denial of Foy's motions for a directed verdict, for judgment notwithstanding the verdict, and to set aside the jury verdict.

I respectfully dissent.